**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 27, 2001

NICOLE M. BEAUDRIE,

    Plaintiff-Appellant,

v

No. 114261

PAULINE HENDERSON,

    Defendant-Appellee,

and

CITY OF DEARBORN, and DEARBORN
POLICE DEPARTMENT,

    Defendants.

_____

YOUNG, J.

Plaintiff was abducted, assaulted, and raped by her ex-boyfriend. This case pertains to the actions of defendant Pauline Henderson, a police dispatcher and friend of the assailant's mother. Defendant Henderson allegedly was contacted at her place of employment by the assailant's mother

while plaintiff was being held captive. Plaintiff alleged that defendant was grossly negligent and engaged in active misconduct when she failed to notify the police of the whereabouts of plaintiff's assailant and acted in concert with the assailant's mother in withholding information from authorities. Defendant argued that the public duty doctrine shielded her from liability, and moved for summary disposition under MCR 2.116(C)(8). The trial court denied defendant's motion, but the Court of Appeals reversed.

We granted leave to consider whether the public duty doctrine, first recognized by this Court in *White v Beasley*, 453 Mich 308; 552 NW2d 1 (1996), should be extended to protect governmental employees other than police officers who are alleged to have failed to provide protection from the criminal acts of third parties. We conclude that, given the comprehensive governmental immunity statute, MCL 691.1407,[1]

---

[1]MCL 691.1407 provides, in relevant part:

(1) Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided in this act, this act does not modify or restrict the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed.

(2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each
(continued...)

2

this judicially created doctrine should not be so extended.
Thus, we reverse the decision of the Court of Appeals and
remand this case to the trial court for further proceedings.

## I.  Factual and Procedural Background

Because this appeal arises under MCR 2.116(C)(8), we take
all material facts from plaintiff's first amended complaint.
According to her complaint, plaintiff was abducted by her
ex-boyfriend, David Wilke, on April 6, 1994.  Earlier that
day, plaintiff had given preliminary examination testimony
against Wilke in a case that arose out of a series of prior

---

[1](...continued)
volunteer acting on behalf of a governmental
agency, and each member of a board, council,
commission, or statutorily created task force of a
governmental agency is immune from tort liability
for an injury to a person or damage to property
caused by the officer, employee, or member while in
the course of employment or service or caused by
the volunteer while acting on behalf of a
governmental agency if all of the following are
met:

(a)  The officer, employee, member, or
volunteer is acting or reasonably believes he or
she is acting within the scope of his or her
authority.

(b) The governmental agency is engaged in the
exercise or discharge of a governmental function.

(c) The officer's, employee's, member's, or
volunteer's conduct does not amount to gross
negligence that is the proximate cause of the
injury or damage.  As used in this subdivision,
"gross negligence" means conduct so reckless as to
demonstrate a substantial lack of concern for
whether an injury results.

assaults committed by Wilke against her, including criminal sexual conduct. Wilke was released on bond.

At approximately 1:21 a.m. on April 7, 1994, the Dearborn Police Department issued an all points bulletin (APB) regarding the suspected abduction, including a description of Wilke and the vehicle that was believed to be involved. The police knew that plaintiff had parked her own vehicle in her driveway, but never made it inside her home. The police also knew that Wilke had criminal charges pending against him involving plaintiff, that he had been released on bond, that he had threatened to kill plaintiff in the past, and that he had access to handguns.[2]

Around 9:30 a.m., defendant, who was working as a dispatcher at the Dearborn Police Department, received a call from Wilke's mother, who was defendant's personal friend. Wilke's mother informed defendant that Wilke was missing, that she believed him to be armed and dangerous, and that it appeared that he had taken plaintiff with him.

Plaintiff's first amended complaint further alleged that

---

[2]Plaintiff's amended complaint specifically quotes the following portion of the APB:

> The victim parked her vehicle in the driveway and never made it inside at her home in the south end of our city. The victim has pending csc charges out against the suspect, and he was freed on bond today. He has threatened to kill her in the past and he does have access to handguns.

4

defendant suspected that Wilke had taken plaintiff to a family-owned trailer at Camp Dearborn. Plaintiff alleged that defendant contacted Camp Dearborn, represented herself as a Dearborn police dispatcher, and requested that Camp Dearborn employees verify whether the suspect vehicle was there. She gave the employees a description of the vehicle, its license plate number, and warned them not to approach the vehicle.

Approximately fifteen minutes later, defendant received notification that Wilke and the vehicle were indeed at Camp Dearborn. At that point, defendant contacted Wilke's mother. Plaintiff alleged that the two women agreed to withhold information from the police until Wilke's mother could contact Wilke's attorney. Wilke's mother, having spoken with Wilke's attorney, allegedly contacted defendant again at approximately 11:45 a.m., at which time they agreed to withhold information about Wilke's whereabouts. At approximately noon, defendant left Dearborn Police Dispatch, picked up Wilke's mother and sister, and drove to Camp Dearborn.

According to plaintiff's first amended complaint, "[a]s a direct and proximate result of these acts and/or omissions by Defendant Pauline Henderson, the brutal rape, beating and abduction of Plaintiff Nicole Beaudrie was allowed to continue, and the suspect, David James Wilke, was allowed the opportunity to escape the fenced perimeter of Camp Dearborn with his victim." Plaintiff subsequently filed suit against

5

defendant,[3] alleging that defendant's conduct amounted to "intentional misconduct . . . active malfeasance, and gross negligence," and that plaintiff's continued victimization was "a direct and proximate result" of defendant's actions.

Defendant moved for summary disposition under MCR 2.116(C)(8) on the ground that, under the public duty doctrine, she did not owe any duty to plaintiff. The trial court denied the motion. The Court of Appeals then reversed in a split decision.[4]

We granted plaintiff's application for leave to appeal. 463 Mich 888 (2000).

## II. Standard of Review

The trial court granted summary disposition to defendants under MCR 2.116(C)(8). We review that decision de novo. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). A motion for summary disposition brought under MCR 2.116(C)(8) tests the legal sufficiency of the complaint on the basis of the pleadings alone. The purpose of such a motion is to determine whether the plaintiff has stated a claim upon which relief can be granted. The motion should be granted if no factual development could possibly justify recovery. *Spiek v*

---

[3]Plaintiff also brought suit against the city of Dearborn and the Dearborn Police Department. However, those parties are not involved in this appeal.

[4]Unpublished opinion per curiam, issued December 4, 1998 (Docket No. 202304).

6

*Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998).

Summary disposition of a plaintiff's gross negligence claim is proper under MCR 2.116(C)(8) if the plaintiff fails to establish a duty in tort. See *Maiden*, *supra* at 135. Whether a defendant owes a plaintiff a duty of care is a question of law for the court. *Id*. at 131.

### III.  History of the Public Duty Doctrine

It appears that the origins of the common-law public duty doctrine can be traced to *South v Maryland*, 59 US (18 How) 396; 15 L Ed 433 (1855).  There, the plaintiff was kidnapped and held for ransom.  Upon his release, the plaintiff sued the county sheriff, alleging that, despite the plaintiff's request for protection, the sheriff neglected and refused to protect him or to otherwise keep the peace.  In rejecting the plaintiff's claim, the United States Supreme Court held that the sheriff's duty to preserve the public peace was "a public duty, for neglect of which he is amenable to the public, and punishable by indictment only."  *Id*. at 403.  The Supreme Court of Tennessee has noted that a clear majority of state courts considering the issue adhere to the public duty doctrine in one form or another.  See *Ezell v Cockrell*, 902 SW2d 394, 399, n 5 (Tenn, 1995).

Before our 1996 decision in *White*, *supra*, this Court had not recognized the public duty doctrine.  However, the lead

opinion in *White* noted that our Court of Appeals had consistently relied on the doctrine as early as 1970. See *id*. at 322, n 7. A majority of the Court agreed that the public duty doctrine serves a useful purpose and should apply in Michigan. *Id*. at 316 (Brickley, C.J., joined by Riley and Weaver, JJ.), 330 (Cavanagh, J., joined by Mallett, J.).

IV. The Scope of the Public-Duty Doctrine under *White*

Before we can determine the future of the public-duty doctrine in Michigan, it is necessary to examine its current state. At issue in *White* was whether the defendant police officer who failed to assist and protect the plaintiff from a criminal assault by a third party was liable in tort. This Court invoked the public duty doctrine and found no liability.

Chief Justice Brickley's lead opinion in *White* adopted the following articulation of the public duty doctrine from Justice Cooley's leading 19th century treatise on torts:

> [I]f the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, must be a public, not an individual injury, and must be redressed, if at all, in some form of public prosecution. On the other hand, if the duty is a duty to the individual, then a neglect to perform it, or to perform it properly, is an individual wrong, and may support an individual action for damages. [*White*, *supra* at 316, quoting 2 Cooley, Torts (4th ed), § 300, pp 385-386.]

However, it is not entirely clear from our fractured decision in *White* whether application of the public duty

8

doctrine was intended to apply to all government employees or only to police officers who are alleged to have failed to provide police protection. The lead opinion suggested an expansive application of the doctrine:

> In conclusion, we find that the public-duty doctrine still serves useful purposes. . . . Government employees should enjoy personal protection from tort liability based on their action in conformity with, or failure to conform to, statutes or ordinances not intended to create tort liability. The job titles of government employees alone should not create a duty to specific members of the public. [*Id.* at 319.]

Fairly read, nothing in the lead opinion indicated an intent to limit application of the public duty doctrine to any particular class of governmental employees.

Justice Boyle agreed with the statement in the lead opinion that "[a]pplied to police officers, the public-duty doctrine insulates officers from tort liability for the negligent failure to provide police protection . . . ." *Id.* at 325. She noted that "a contrary result could lead to officers arresting (and detaining) all persons who might conceivably jeopardize a foreseeable plaintiff." *Id.* at 329-330. However, Justice Boyle argued that, even when limited to police officers, the doctrine should only apply to cases involving *nonfeasance*, i.e., "'passive inaction or the failure to actively protect others from harm.'" *Id.* at 328, quoting *Williams v Cunningham*, 429 Mich 495, 498-499; 418 NW2d 381 (1988).

9

Justice Cavanagh would have limited the decision "to only those cases in which liability is alleged on the basis of the police officer's failure to protect an individual from the actions of a *third party*."  *Id*. at 330 (Cavanagh, J., concurring in part and dissenting in part).  He opined that the case "should have no bearing in a case involving an injury caused by the police officer's own actions."  *Id*.  Justice Cavanagh noted that "the public-duty doctrine recognizes that police officers and their departments must make discretionary or policy decisions in order to carry out the duties imposed on them."  *Id*. at 331.  However, Justice Cavanagh also suggested that the public duty doctrine should apply to "fire fighters, life guards, and similar governmental safety professionals."  *Id*. at 331, n 1.

Justice Levin dissented, arguing that the public-duty doctrine is inconsistent with the governmental immunity statute, which "hold[s] governmental officers and employees, except those at the highest levels, subject to liability on the basis of gross negligence, defined as reckless conduct." *Id*. at 342-343.

Clearly then, the various opinions in *White* offered relatively little guidance to lower courts regarding the scope of the doctrine recognized in that case.  Since *White*, the Court of Appeals has not hesitated broadly to apply the public

duty doctrine outside the police protection context.[5]

V.    The Future of the Public Duty Doctrine in Michigan

We now address the issue left open in *White*:  should the public duty doctrine apply in cases other than those alleging a failure to provide police protection from the criminal acts of a third party?  As illustrated by our differing opinions in *White,* as well as the split decision in the Court of Appeals in this case, the doctrine has proven to be difficult to define and apply.  Even more important, further expansion of the doctrine is unwarranted because the governmental immunity statute already provides government employees with significant protections from liability.

Thus, we reject further expansion of the public duty doctrine.  The liability of government employees, other than those who have allegedly failed to provide police protection, should be determined using traditional tort principles without regard to the defendant's status as a government employee.

_____

[5]See, e.g., *Elmadari v Filiak*, ___ Mich App ___; ___ NW2d ___ (2001) (a city maintenance worker owed no duty to a child injured by an allegedly dangerous slide); *McGoldrick v Holiday Amusements, Inc*, 242 Mich App 286; 618 NW2d 98 (2000) (a state ski lift inspector owed no duty to an injured skier); *Koenig v South Haven*, 221 Mich App 711; 562 NW2d 509 (1997), rev'd in part on other grounds 460 Mich 667; 597 NW2d 99 (1999) (city officials owed no duty to decedent who was swept off a pier into a lake during inclement weather); *Reno v Chung*, 220 Mich App 102; 559 NW2d 308 (1996), aff'd on other grounds 461 Mich 109; 597 NW2d 817 (1999) (a medical examiner owed no duty to the plaintiff who was mistakenly convicted of murder in part because of the examiner's report).

11

A. Shortcomings of the Public Duty Doctrine

As stated, the public duty doctrine is widely applied. The lead opinion in *White* set forth two commonly cited justifications for retaining the doctrine: "First, the doctrine protects governments from unreasonable interference with policy decisions, and, second, it protects government employees from unreasonable liability." *Id.* at 317. However, as the Supreme Court of Colorado recognized in *Leake v Cain*, 720 P2d 152, 158 (Colo, 1986):

> [A] growing number of courts have concluded that the underlying purposes of the public duty rule are better served by the application of conventional tort principles and the protection afforded by statutes governing sovereign immunity than by a rule that precludes a finding of an actionable duty on the basis of the defendant's status as a public entity.

Indeed, a number of courts that have examined the doctrine in detail have rejected it.[6]

As formulated by Justice Cooley, the public duty doctrine provides only that a plaintiff cannot rely on the fact that a public employee owes general duties to the public at large to support a claim of negligence. Justice Cooley explained:

---

[6]See, e.g., *Adams v State*, 555 P2d 235 (Alas, 1976); *Ryan v State*, 134 Ariz 308; 656 P2d 597 (1982); *Leake*, *supra*; *Commercial Carrier Corp v Indian River Co*, 371 So 2d 1010 (Fla, 1979); *Jean W v Commonwealth*, 414 Mass 496; 610 NE2d 305 (1993); *Maple v Omaha*, 222 Neb 293; 384 NW2d 254 (1986); *Brennen v City of Eugene*, 285 Or 401; 591 P2d 719 (1979); *Hudson v East Montpelier*, 161 Vt 168; 638 A2d 561 (1993); *Coffey v Milwaukee*, 74 Wis 2d 526; 247 NW2d 132 (1976).

> "The failure of a public officer to perform a public duty can constitute an individual wrong only when some person can show that in the public duty was involved also a duty to himself as an individual, and that he has suffered a special and peculiar injury by reason of its nonperformance." [2 Cooley, Torts (4th ed), § 300, p 386 (citation omitted).]

Such an analysis merely states the obvious: a plaintiff must show some common-law duty owed to him by the public employee.

However, application of the public duty doctrine has not been so limited. In our view, application of the doctrine has been reduced to a conclusory statement that where there is a duty to all, there is a duty to none. Such a "reformulation" of the doctrine is tantamount to a grant of common-law governmental immunity, an area already dealt with by statute in many jurisdictions, including Michigan. The Supreme Court of Alaska was one of the first courts to reject the doctrine on precisely this basis. In *Adams v State*, 555 P2d 235 (Alas, 1976), the plaintiffs were injured in a hotel fire. The hotel had been inspected eight months earlier by the state fire marshall's office. It was alleged that the state inspectors had failed to abate several hazards that they had discovered. Rejecting the argument that the state owed a duty only to the public generally, the Supreme Court of Alaska noted that an application of the public duty doctrine in that case would have resulted in a finding of no duty even though "a private defendant would have owed such a duty . . . ." *Id*. at 242.

13

In the absence of statutory immunity, the court declined to make it more difficult to establish a duty when the state is the defendant. *Id.*[7]

Other courts have also recognized that routine application of the public duty doctrine has resulted in an artificial distinction between so-called "public" and "private" duties. In *Commercial Carrier Corp v Indian River Co*, 371 So 2d 1010, 1015 (Fla, 1979), the Florida Supreme Court explained that it is

> circuitous reasoning to conclude that no cause of action exists for a negligent act or omission by an agent of the state or its political subdivision where the duty breached is said to be owed to the public at large but not to any particular person.

In rejecting the public duty doctrine in *Ryan v State*, 134 Ariz 308, 310; 656 P2d 597 (1982), the Arizona Supreme Court found the attempt to distinguish between public and individual duties to be a "speculative exercise."[8]

We agree with these sentiments. The fact that a public employee owes general duties to the public at large does not logically preclude the imposition of a private, individual

---

[7]As noted in *Wilson v Anchorage*, 669 P2d 569, 571 (Alas, 1983), the Alaska Legislature has since conferred upon municipalities immunity from liability arising from negligent inspections.

[8]Following the decision in *Ryan*, the Arizona Legislature enacted various immunity provisions. See *Clouse v Dep't of Public Safety*, 194 Ariz 473, 476-477; 984 P2d 559 (Ariz App, 1998).

duty.  These duties are not mutually exclusive.  Consequently, any attempt to draw a distinction between a government employee's "public duty" and "private duty" has proven to be confusing and prone to arbitrary and inconsistent application.

Consider, for example, the case of building inspectors.  As did the *Adams* court, the Supreme Court of Wisconsin, in *Coffey v Milwaukee*, 74 Wis 2d 526; 247 NW2d 132 (1976), imposed on a building inspector an actionable duty of care to perform fire safety inspections in a reasonable manner.  The court held that there was no distinction in that case between "a 'public duty' and a '[private] duty.'"  *Id*. at 540.  Reaching the opposite result, in *Lynn v Overlook Development*, 98 NC App 75, 78; 389 SE2d 609 (1990), aff'd in part and rev'd in part 328 NC 689; 403 SE2d 469 (1991), the Court of Appeals of North Carolina held that the duty to carry out building inspections was owed "not to the plaintiffs, individually, but to the general public."[9]  However, the conclusory analysis in *Lynn* merely begs the question why a duty to carry out building inspections, which undeniably benefits the general public, cannot also give rise to an individual duty in an appropriate

_____

[9]We note that, although it did not expressly overrule *Lynn*, the Supreme Court of North Carolina recently decided that the public duty doctrine should no longer apply outside the police protection context.  *Thompson v Waters*, 351 NC 462, 464-465; 526 SE2d 650 (2000).

case.[10]

From these examples it is clear that the courts "have not managed to draw an intellectually defensible line between immune 'public' duties and actionable negligence." *Jean W v Commonwealth*, 414 Mass 496, 510; 610 NE2d 305 (1993) (citation omitted).  We will not attempt to do so because a traditional common-law duty analysis provides a far more familiar and workable framework for determining whether a public employee owes a tort-enforceable duty in a given case.  Moreover, as explained below, the need for an expanded application of the public duty doctrine has been undermined by the protections afforded governmental employees by our state's broad governmental immunity statute.

B.    Relationship Between the Public Duty Doctrine and the Governmental Immunity Act

A government employee is immune from tort liability under the governmental immunity statute if all the following conditions are met:

> (a)  The officer . . . is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b)  The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c)  The officer's . . . conduct does not

---

[10]Indeed, Justice Cooley himself recognized that, in the inspection context, "duties are imposed in respect to the public and also in respect to individuals."  2 Cooley, Torts (4th ed), § 304, p 403.

16

amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results. [MCL 691.1407(2).]

In our view, the Legislature has expressed through these provisions its intent to subject lower-level government employees to potential liability for performing their jobs in a grossly negligent manner.[11] This is so even though the governmental agency itself would be exempt from liability. See MCL 691.1407(1). Thus, expanding the common-law public duty doctrine to shield all government employees from tort liability is at least arguably inconsistent with this statutory scheme.[12]

Even if that were not the case, the fact that the governmental immunity statute makes public employees immune from liability for conduct that does not amount to "gross negligence" and is not "the proximate cause" of the injury certainly undermines the need for the common-law "immunity"

---

[11]Judges, legislators, and the elective or highest appointive executive officials of all levels of government are, of course, absolutely immune from liability for their policy-making decisions. See MCL 691.1407(5).

[12]However, we reject Justice Levin's suggestion in *White*, *supra* at 355, that MCL 691.1407 "defines the duty pursuant to which a governmental employee is subject to liability." The statute does not *create* a cause of action. Plaintiffs are still required to establish a common-law duty.

17

granted by the public duty doctrine.[13]

The Supreme Court of Vermont employed similar reasoning in *Hudson v East Montpelier*, 161 Vt 168, 179; 638 A2d 561 (1993), where it "[d]ecline[d] to adopt the confusing and inconsistent public duty doctrine as a means of limiting liability of government employees who are already protected to some extent by [statutory immunity.]"

We recognize that public employees often are required to perform various tasks by virtue of their position. However, "[p]rivate persons [also] have affirmative duties arising from their employment responsibilities that others do not have." *Jean W, supra* at 508. Again, the governmental immunity act contemplates that government employees may be held liable for performing their jobs in a grossly negligent manner. Indeed, the Legislature has expressly authorized government agencies to defend and indemnify employees facing potential tort liability for injuries caused by the employee "while in the course of employment and while acting within the scope of his or her authority . . . ." MCL 691.1408(1).

In sum, the Legislature, through the governmental immunity statute, has signified that a defendant's status as

[13]Although we recognized in *White, supra*, that the public duty doctrine is part of tort law, *id*. at 323, the effect of the rule arguably is identical to that of governmental immunity. "Under both doctrines, the existence of liability depends entirely upon the public status of the defendant." *Leake, supra* at 160.

18

a government employee alone does not preclude liability. We choose not to undermine that public policy choice by expanding the application of the judicially created public duty doctrine.

Consistent with our decision in *White*, we will, however, continue to apply the public duty doctrine, and its concomitant "special relationship" exception,[14] in cases involving an alleged failure to provide police protection.[15] We agree with Chief Justice Brickley's statement in *White* that

[14]Under the "special relationship" test adopted and applied by a majority of the Court in *White*, a police officer may be exposed to liability for failure to protect a plaintiff from the criminal acts of a third party only if the following elements are met:

> "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured;
>
> (2) knowledge on the part of the municipality's agent that inaction could lead to harm;
>
> (3) some form of direct contact between the municipality's agents and the injured party; and
>
> (4) that party's justifiable reliance on the municipality's affirmative undertaking . . . ."
> [*White, supra* at 320 (citation omitted).]

[15]The Supreme Court of North Carolina has adopted such a distinction. *Thompson v Waters*, 351 NC 462, 464-465; 526 SE2d 650 (2000). As has the Supreme Court of Georgia. See *Hamilton v Cannon*, 267 Ga 655; 482 SE2d 370 (1997); *Dep't of Transportation v Brown*, 267 Ga 6; 471 SE2d 849 (1996). Interestingly, in its decision limiting application of the public duty doctrine to the police protection context, the Supreme Court of North Carolina cited the same concerns that we express today. *Thompson, supra.*

"[p]olice officers must work in unusual circumstances. They deserve unusual protection." *Id*. at 321. Moreover, the public duty doctrine as applied in *White* is consistent with the general common-law rule that no individual has a duty to protect another who is endangered by a third person's conduct absent "a 'special relationship' either between the defendant and the victim, or the defendant and the third party who caused the injury." *Murdock v Higgins*, 454 Mich 46, 54; 559 NW2d 639 (1997).

However, for purposes of determining the liability of public employees other than police officers, we will determine a government employee's duty using the same traditional common-law duty analysis applicable to private individuals.

## VI. Application

The Court of Appeals relied solely on the public duty doctrine in ordering that summary disposition be entered in defendant's favor under MCR 2.116(C)(8). As stated, application of the public duty doctrine is limited to cases like *White* involving an alleged failure of a police officer to protect a plaintiff from the criminal acts of a third party. We agree with plaintiff that this case clearly does not fall within the circumstances presented in *White*. Accordingly, the Court of Appeals erred in relying on the public duty doctrine to dismiss plaintiff's case.

## VII. Conclusion

Distinguishing between a government employee's "public" and "private" duties has proven to be an unwieldy exercise. Moreover, the need for expanding the public duty doctrine outside the police protection context is undermined by the comprehensive protections from liability provided to government employees by the governmental immunity statute. Therefore, we decline to do so.  The decision of the Court of Appeals is reversed, and this case is remanded to the trial court for further proceedings.

CORRIGAN, C.J., and WEAVER, TAYLOR, and MARKMAN, JJ., concurred with YOUNG, J.

NICOLE M. BEAUDRIE,

    Plaintiff-Appellant,

v                                      No. 114261

PAULINE HENDERSON,

    Defendant-Appellee,

and

CITY OF DEARBORN, and DEARBORN
POLICE DEPARTMENT,

    Defendants.
_____

CAVANAGH, J. (*concurring*).

    I join parts I and II of the majority opinion, which accurately discuss the pleadings. I also join the majority's decision to reverse. I write separately, however, because I believe the majority goes beyond what is necessary to resolve the limited question before us. I would hold only that (1) the plaintiff successfully pleaded a claim upon which relief may be granted, and (2) that the defendant failed to overcome

the plaintiff's amended pleadings because the defendant's claim of nonstatutory immunity was predicated on inapplicable precedent.

I believe the majority's discussion of the history and wisdom of the public duty doctrine is misplaced, given that we are examining a motion for summary disposition that tests only the sufficiency of the pleadings. MCR 2.116(C)(8).  Therefore, I would not delve into the statutory issues discussed by the majority.  Instead, I would resolve this case on the basis of the narrow grounds discussed in this opinion.

I

MCR 2.116(C)(8) "tests the legal sufficiency of the claim on the pleadings alone to determine whether the plaintiff has stated a claim on which relief may be granted.  The motion must be granted if no factual development could justify the plaintiffs' claim for relief." *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998).  The plaintiff's first amended complaint alleged that the defendant had engaged in gross negligence and active misconduct.[1]  The most direct discussion of gross negligence and active misconduct can be found at the first paragraph 27 of the plaintiff's amended complaint, which states as follows:

---

[1] The plaintiff labels her claims under the title, "Count I-Gross Negligence/Active Misconduct."

2

At all relevant times, Defendant Pauline Henderson committed acts of intentional misconduct, and active malfeasance, and gross negligence, which are not protected by the Public Duty Doctrine and/or governmental immunity including, but not limited to, the following:

a. Representing herself to be conducting official police business for improper purposes;

b. Using her authority as a Dearborn Police Dispatcher to verify the location of the suspect for improper purposes;

c. Actively withholding and concealing information from the authorities regarding the verified location of a felony suspect which she otherwise would have provided without hesitation;

d. Purposefully accepting instruction from the suspect's mother and criminal attorney in contravention of her duties;

e. Intentionally conspiring to keep the verified whereabouts of the suspect concealed despite actual knowledge of a police emergency;

f. Affirmatively abrogating her obligations in order to prevent the authorities from apprehending a known suspect in the commission of a brutal felony;

g. Intentionally abandoning her post as a police dispatcher in order to engage in misconduct;

h. Driving to Camp Dearborn to meet with the suspect;

i. Engaging in other active misconduct, gross negligence and/or intentional malfeasance which may become known prior to trial.

Further in support of her claim, the plaintiff repeatedly alleged that the defendant conspired and agreed to abrogate her duties as a police dispatcher and to conceal information

3

from the authorities.  The complaint also specifically alleged that the defendant's active misconduct was "intended to prevent police authorities from saving a rape and kidnapping victim," that the defendant's intentional acts and omissions proximately resulted in the continued abuse of the plaintiff for an additional ten hours, and that damages resulted from the defendant's acts and omissions.

## II

In response to the allegations raised by the plaintiff, the defendant brought a motion for summary disposition pursuant to MCR 2.116 (C)(8).  In support of its position that no amount of factual development could justify the plaintiff's claim, the defendant argued that defendant Henderson is protected by the public duty doctrine.

The basis of defendant's public duty doctrine claim

The defendant's brief in support of summary disposition claimed that "Under the public duty doctrine, a public employee owes a duty to the general public and not to any one individual unless a special relationship exists between the employee and the individual."  In the defendant's view, the plaintiff in the present case failed to establish that a special relationship existed, citing *White v Humbert*, 206 Mich App 459; 522 NW2d 681 (1994), and *Reno v Chung*, 220 Mich App 102, 105; 559 NW2d 308 (1996), aff'd sub nom *Maiden v Rozwood*,

461 Mich 109; 597 NW2d 817 (1999). As such, the public duty doctrine would bar recovery. In response to the defendant's motion for summary disposition, the plaintiff argued that the defendant was not protected by the public duty doctrine because the doctrine applies only to cases involving nonfeasance. The present complaint alleged active misconduct amounting to malfeasance. Further, the plaintiff alleged that the defendant's actions arose out her relationship with David Wilke and his mother. Thus, plaintiff argued, the public duty doctrine would be inapplicable. The defendant filed a reply brief, arguing that the malfeasance versus nonfeasance argument advocated by the defendant was unsupportable because "[t]here is no allegation or implication that Henderson took any dynamic step toward aiding David Wilke in his criminal activity."

I cannot agree with the defendant that the public duty doctrine shields her from liability. I believe that the defendant applies the public duty doctrine too broadly, and ignores the plaintiff's allegations that she called Camp Dearborn, confirmed Wilke's presence there, left work, drove to Camp Dearborn, and collaborated with Kondzer and Wilke's attorney in addition to deciding to withhold information from the authorities.

5

As noted in the majority opinion, the public duty doctrine on which the defendant builds her argument was the subject of much discussion in *White v Beasley*, 453 Mich 308, 552 NW2d 1 (1996). There, in separate opinions, a majority of this Court adopted a formulation of the doctrine that provides that an officer may be shielded from an individual action for damages when the officer is being charged with failing to perform or inadequately performing a duty to the public. Yet, the opinion did not preclude the possibility that the officer nonetheless might owe an individual enforceable duty in tort.[2] Though in *Beasley*, this Court acknowledged a "special relationship exception" to the public duty doctrine, the Court did not hold that the doctrine is so broad that a public officer would automatically be protected from liability under the public duty doctrine when the officer's abrogation of

---

[2] "[I]f the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, must be a public, not an individual injury, and must be redressed, if at all, in some form of public prosecution. On the other hand, if the duty is a duty to the individual, then a neglect to perform it, or to perform it properly is an individual wrong, and may support an individual action for damages." [*Beasley* at 316, quoting 2 Cooley, Torts (4th ed), § 300, pp 385-386.]

duties and personal involvement in the circumstances surrounding the plaintiff allegedly caused the plaintiff's injuries to result.

Though the defendant tries to squeeze her case into the parameters of *Beasley*, her efforts must fail because this case is distinguishable from *Beasley*. The plaintiff is not asserting that the defendant should be liable simply because the defendant was a police dispatcher who owed a general governmental duty to the plaintiff as a member of the public. Instead, the pleadings assert that the defendant became personally involved by acting upon special knowledge that she obtained because of a personal relationship with the assailant and his mother, and that the defendant chose to abrogate rather than perform her duties as a police dispatcher, despite the fact that she received information while on duty. According to the complaint, the relationship between the defendant, Kondzer, and Wilke made the defendant privy to special information about the alleged attack on the plaintiff. Thus, it was not the defendant's position as a police dispatcher that gave rise to the alleged misconduct, it was her relationship with the assailant's mother. Additionally, the complaint alleged various ways in which the defendant actively engaged in conduct that delayed apprehension of Wilke so that injury to the plaintiff resulted.

The allegations throughout the plaintiff's amended complaint, and specifically listed in the first paragraph 27, state that the defendant knowingly and intentionally abrogated her duties as a police dispatcher and became involved in the case for personal reasons. I believe that the plaintiff's repeated references to the relationship between the defendant, Kondzer, and Wilke, if accepted as true, would support a claim for a common-law cause of action. As such, I am not persuaded that this is the type of case in which the public duty doctrine of *Beasley* should be applied. Thus, the basis for the defendant's MCR 2.116(C)(8) motion collapses, as does the decision of the Court of Appeals. Therefore, I join the majority's decision to reverse.

### III

I agree with the trial court that the defendant failed to establish that the plaintiff failed to state a claim upon which relief may be granted. As such, summary disposition was correctly denied. Therefore, I would reverse the decision of the Court of Appeals and remand this case for further proceedings.

KELLY, J., concurred with CAVANAGH, J.