# STATE OF MICHIGAN

# COURT OF APPEALS

U.S. BANK NATIONAL ASSOCIATION,

        Plaintiff / Counter-Defendant / Appellee,

v

DAVID L. CARSWELL,

        Defendant-Appellant,

and

RATTON & WANGLER, PLC,

        Defendant,

and

NICOLE H. MILLER, f/k/a NICOLE H. CARSWELL,

        Defendant / Counter-Plaintiff / Third-Party-Plaintiff / Appellant,

v

LITTON LOAN SERVICING, LLC,

        Third-Party-Defendant / Appellee.

UNPUBLISHED
May 5, 2015

No. 320416
Wayne Circuit Court
LC No. 12-006823-CH

---

Before: TALBOT, C.J., and MURPHY and GLEICHER, JJ.

PER CURIAM.

    Defendants-appellants David Carswell and Nicole Miller (appellants) appeal by leave granted the trial court's order granting summary disposition in favor of plaintiff U.S. Bank

-1-

National Association (UBNA) in this case involving UBNA's effort to judicially foreclose on real property formerly owned by both appellants and currently owned solely by appellant Nicole Miller.[1] We affirm.

## I. HISTORY – SUBSTANTIVE AND PROCEDURAL FACTS

On November 5, 2001, appellants, who were married at that time but later divorced, executed an adjustable-rate promissory note as obligors in the amount of $325,500. The lender was New Century Mortgage Corporation (New Century). On the same day, appellants signed a 30-year mortgage in favor of New Century as security for the note. The mortgage encumbered appellants' home and was subsequently recorded on May 1, 2002. In a week's time, on November 12, 2001, New Century assigned the mortgage to UBNA.[2] The assignment of mortgage was not recorded until March 6, 2003. On August 28, 2003, UBNA assigned the mortgage to The Provident Bank. This assignment was recorded on September 16, 2003.

In 2004, appellants' divorce was finalized, and David Carswell quitclaimed his interest in the encumbered property to Nicole Miller, f/k/a Nicole Carswell, on October 7, 2004, ostensibly pursuant to the divorce judgment. According to filings by Morgan Stanley Dean Witter Capital 1, Inc., with the United States Securities and Exchange Commission (SEC), of which we take

---

[1] Appellants filed this appeal as if it were an appeal by right, and UBNA argued that the order granting summary disposition was not a final order appealable as of right, although an order of foreclosure that was a true final order did enter after appellants filed the appeal. This Court by order addressed the challenge, ruling "that the instant appeal shall be treated as an application for leave to appeal and that leave to appeal is GRANTED." *US Bank Nat'l Ass'n v Carswell*, unpublished order of the Court of Appeals, entered December 29, 2014 (Docket No. 320416).

[2] In all of the real estate documents and court filings, UBNA is identified "as Trustee under the Pooling and Servicing Agreement [PSA] dated as of March 1, 2002, Morgan Stanley Dean Witter Capital 1 Inc., Trustee 2002-NC-1." With respect to such PSAs, we note the following background discussion in Peterson, *Foreclosure, Subprime Mortgage Lending, & The Mortgage Electronic Registration Sys*, 78 U Cincinnati L Rev 1359, 1367 (2010):

> Typically subprime originators quickly assign their loans to a seller, which is usually a subsidiary of an investment bank. Ultimately the promissory note and mortgage are then assigned, along with many other loans, to a special purpose vehicle that usually takes the form of a trust. A special purpose vehicle is a business entity that is exclusively a repository for the loans; it does not have any employees, offices, or assets other than the loans it purchases. A pooling and servicing agreement [PSA] specifies a trustee to manage the loan assets and a servicer to collect monthly payments and interact with the homeowner. The trust then transfers the right to receive the income stream to an underwriter and then various investors such as mutual funds, hedge funds, pension funds, and insurance companies. [See also *Anderson v Burson*, 424 Md App 232, 237; 35 A3d 452 (2011).]

judicial notice, MRE 201, on December 1, 2004, third-party defendant Litton Loan Servicing, LLC (Litton), was appointed as successor mortgage servicer with respect to mortgages held in trust under the March 2002 PSA; Provident Bank had been the servicer up to that point.[3] On February 10, 2005, divorce counsel for one of the appellants, defendant Ratton & Wangler, PLC (R&W), recorded a claim of attorney lien pursuant to the divorce judgment in the amount of $3,901 with respect to the property already encumbered by the mortgage.

On October 27, 2005, Provident Bank assigned the mortgage and note *back* to UBNA, which assignment was recorded on November 8, 2005. Litton maintained its status as the mortgage servicer. It is this 2005 assignment to UBNA that conveyed the interest upon which UBNA sought to foreclose seven years later. One of appellants' arguments below and on appeal is that UBNA lacked the capacity as trustee under the 2002 PSA to be an assignee of the note and mortgage in 2005 as necessary to legally and soundly accept the assignment; therefore, absent a valid conveyance of interests under the assignment, UBNA lacked standing and the capacity to later foreclose on the property. In support, appellants claim that the 2002 PSA had a March 27, 2002 closing date, precluding the transfer of mortgage interests thereafter into the PSA-created trust of which UBNA was the trustee, and thereby barring the 2005 transfer under the assignment. In a request for admissions served by appellants on UBNA early in the litigation, appellants asked UBNA to "[a]dmit that the closing date to transfer all mortgages to the Trust was March 27, 2002." UBNA responded:

> On information and belief, Plaintiff believes that the pooling and servicing agreement references a closing date of March 27, 2002[,] but denies that the relevant section of the document states that all mortgages must be transferred by that closing date. Plaintiff cannot fully admit or deny this request as Defendants did not provide the relevant portions of the document(s) necessary to respond. Plaintiff continues to investigate and will supplement this response as necessary. [4.]

There was never any follow-up or supplementation, nor did appellants ever seek production of the 2002 PSA during discovery. Again, the 2002 PSA is not part of the record.

---

[3] While we were able to locate various SEC filings with respect to amendments of the March 2002 PSA, we could not find the 2002 PSA itself and it was never made part of the lower court record. We also note that a "mortgage servicer" is "a person that, directly or indirectly, services or offers to service mortgage loans." MCL 445.1651a(s).

[4] In other answers to the request for admissions, UBNA indicated that appellants had not presented UBNA with the referenced PSA, as if the PSA would be in the hands of or easily accessible by appellants as mortgagors. It would seem that UBNA, as trustee under the PSA, would have direct access to the PSA, and we find this aspect of the case somewhat troubling.

Returning to the chronology of events, appellants started to have problems making the mortgage payments, and by 2006 they were in default.[5]   In May 2006, both appellants and UBNA executed a loan modification of mortgage agreement, amending and supplementing the original mortgage; the agreement was recorded on July 12, 2006.  Litton prepared the agreement and continued to act as the mortgage servicer.  The loan modification agreement indicated that the balance on the note and mortgage was $345,411, including capitalized interest to date, that a fixed rate of interest at eight percent would apply for the remainder of the loan's term (new maturity date of July 2033), and that monthly mortgage payments would be $2,598.[6]  UBNA alleged in its complaint that appellants stopped making mortgage payments under the modification agreement in August 2008, and there was no evidence to the contrary.

Contained in the record and heavily relied on by appellants for purposes of various contract-related claims are two loan workout plans signed on July 14, 2009, and November 12, 2009, by Nicole Miller.  The plans, which indicated that they represented step one of a two-step documentation process, were not signed by David Carswell, nor by a representative of UBNA or Litton.  The loan workout plan signed in November 2009, which was a revision of the version signed in July 2009 and which would control assuming its validity, provided:

> If I am in compliance with this Loan Workout Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement . . ., as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.

The November 2009 loan workout plan included a trial period plan (TPP), calling for payments of $2,099 on December 1, 2009, on January 1, 2010, and again on February 1, 2010.[7] This loan workout plan also stated that the signatory understood that the first payment under the TPP had to be received no later than December 1, 2009, or else he or she "may not be accepted into the Home Affordable Modification Program [HAMP]."[8]  The November 2009 loan workout

---

[5] The record fails to reveal whether appellant Nicole Miller became solely responsible for making the mortgage payments following the divorce and conveyance of the property to her, which is often the case in divorce judgments.  Of course, the family court only had the power to determine appellants' rights and responsibilities in relationship to each other relative to the making of mortgage payments, as the court's authority was confined to the divorce proceedings; both appellants remained liable on the note and mortgage in relationship to the mortgagee UBNA regardless of the divorce judgment.  See *Souden v Souden*, 303 Mich App 406, 410; 844 NW2d 151 (2013) ("a divorce court lacks jurisdiction to adjudicate the rights of third-party creditors").

[6] Initial monthly payments had been $2,678.

[7] The July 2009 loan workout plan had language that was generally identical to the November plan (standard form), with minor changes in dates and dollar amounts.

[8]  In *JP Morgan Chase Bank, NA v Horvath*, 862 F Supp 2d 744, 748 (SD Ohio, 2012), the federal district court explained the nature of the HAMP:

plan further indicated that any foreclosure proceedings would be suspended provided that the signatory continued to meet the plan's obligations. Forming an estoppel and/or part-performance argument by appellants in response to a statute of frauds defense asserted by UBNA relative to the lack of UBNA or Litton's signature on the workout plans, appellants point to a letter from Litton to David Carswell dated December 31, 2009. The letter confirmed and reminded Carswell of an Internet transaction that he had authorized for the payment of $2,099 to be made from a Flagstar Bank checking account on January 1, 2010. There is no evidence in the record that this transaction was ever successfully completed, nor is there any evidence that the other two TPP payments were even attempted, let alone made. Appellants did not submit any deposition testimony, affidavits, or other documentary evidence showing compliance with the loan workout plans or TPP, assuming that the plans even constituted valid and enforceable agreements.

On June 21, 2011, a notice of default and intent to accelerate was sent by Litton to each appellant. The notices indicated that $127,537 was needed to bring the loan current and that appellants had 45 days to cure or "Litton [would] accelerate the maturity date of the Note[,] . . . declare all outstanding amounts under the Note immediately due and payable[,]" and proceed to foreclosure. Appellants did not cure the default.

On May 21, 2012, UBNA filed a complaint to foreclose on the mortgage, MCL 600.3101 *et seq.* (judicial foreclosure), alleging that appellants had defaulted by failing to make payments on the loan since August 2008, leaving an outstanding balance of $336,652. Aside from

---

"On October 8, 2008, President Bush signed into law the Emergency Economic Stabilization Act of 2008 ("EESA"). Section 109 required the Secretary of the Treasury ("the Secretary") to take certain measures in order to encourage and facilitate loan modifications. 12 USC 5219. . . . .

The EESA authorized the Secretary of the Treasury, FHFA [Federal Housing Finance Agency], Fannie Mae, and Freddie Mac to create the Making Home Affordable Program on February 18, 2009, which consists of two components: (1) the Home Affordable Refinance Program, and (2) the HAMP. The HAMP aims to financially assist three to four million homeowners who have defaulted on their mortgages or who are in imminent risk of default by reducing monthly payments to sustainable levels.

The HAMP works by providing financial incentives to participating mortgage servicers to modify the terms of eligible loans. On March 4, 2009, the Secretary issued guidelines under the HAMP requiring lenders to consider borrowers for loan modifications and suspend foreclosure activities while a given borrower was being evaluated for a modification. U.S. Dep't of the Treasury, Home Affordable Modification Program Guidelines (March 4, 2009)." [Citation omitted.]

appellants, UBNA also named R&W as a defendant in light of its existing attorney's lien, which UBNA alleged was subordinate to its superior lien. R&W's position was that its own lien was superior, given that it was recorded before the 2006 loan modification agreement was executed and recorded, that there was no subordination agreement between R&W and UBNA, and considering that the loan modification agreement materially prejudiced R&W. Eventually, a settlement was reached between R&W, appellants, and UBNA, and a stipulation and order was entered dismissing R&W from the case. UBNA later filed an amended complaint adding as defendants the state of Michigan and the United States upon discovering that, in connection with the mortgaged property, there were three federal tax liens (2003-2005) and three state tax liens (2006, 2009, and 2011) for nearly $85,000 in total unpaid taxes. Subsequently, stipulations and orders were entered dismissing the state and federal defendants, whereby they acknowledged having junior liens that were subordinate to the mortgage and that no funds would likely be available to them upon foreclosure of the mortgage.[9]

Appellant Nicole Miller filed a counterclaim against UBNA and a third-party complaint against Litton, as contained in a single document for filing.[10] Miller alleged that the UBNA-related, PSA-created trust "may or may not have been registered with and securitized by the [SEC] or registered with the State of Michigan," that UBNA had "failed to establish that it . . . followed the terms of the PSA in that the closing date of the Trust was in 2002" and "the mortgage . . . [was] ultimately transferred [via the 2005 assignment] into the Trust after the closing date which is a prerequisite to capacity," and that UBNA thus did "not have the legal authority, ownership, capacity or privity to maintain the subject property."[11] Miller also alleged that Litton promised in the 2009 loan workout plans that if she made the TPP payments and was true and accurate in regard to representations about her financial circumstances, she would be accepted into the HAMP and provided a permanent loan modification agreement comparable to the one executed in 2006. Miller contended that she satisfied these qualification conditions, yet she was refused a permanent loan modification agreement. Based on the preceding broad claims, i.e., possible registration and securitization shortcomings of the PSA-created trust, UBNA's lack of capacity to accept a mortgage assignment after the PSA's closing date, and UBNA's violation of the loan workout plans, Miller set forth counts sounding in quiet title, breach of contract, specific performance, breach of the duty of good faith and fair dealing, and promissory estoppel.

In a motion for summary disposition filed pursuant to MCR 2.116(C)(8), (9), and (10), UBNA argued that appellants had failed to state any valid defense to its complaint seeking

---

[9] The dismissal of the United States as a party was conditioned on the unavailability of surplus funds following a foreclosure.

[10] Miller framed the complaint against Litton as a "cross-claim," but Litton had not been a party to the action at the time of Miller's filing and thus the complaint against Litton is properly characterized as a third-party complaint. MCR 2.204(A).

[11] With minor adjustments, the entire substance of the counterclaim and third-party complaint is essentially replicated in and woven into appellants' later response to UBNA's motion for summary disposition and their brief on appeal.

judicial foreclosure of the mortgage, that the documentation presented by UBNA conclusively established that it was entitled to judgment as a matter of law, and that the counterclaim failed to state a valid cause of action relative to all of the alleged counts. UBNA contended that it was the mortgagee by way of valid assignments properly recorded and the true holder of the note; therefore, it had the capacity and standing to file its foreclosure complaint. With respect to the alleged 2009 loan workout plans, UBNA maintained that they were unenforceable as they did not comply with the statute of frauds applicable to agreements with financial institutions, MCL 566.132(2),[12] where neither UBNA nor Litton signed the plans. UBNA further argued that appellant David Carswell's necessary signature was missing from the loan workout documents. Additionally, UBNA asserted that appellants had no documentary evidence showing compliance with the loan workout plans or related TPP, assuming their validity, and thus appellants were not entitled to a permanent loan modification agreement or participation in the HAMP. Aside from the many documents already alluded to in this opinion, UBNA also attached an affidavit of mortgage debt executed on August 2, 2012, by an officer of Ocwen Loan Servicing, LLC (Ocwen), which evidently succeeded Litton as the servicing agent on the loan. The Ocwen officer averred that UBNA held the promissory note on appellants' loan, that appellants had defaulted on the loan, that appellants failed to cure the default, and that the total amount owing as of August 2012 was $502,807, which included the loan's balance, accrued interest, late charges, escrow advances, and prior fees. After UBNA filed its motion for summary disposition, Litton filed a document concurring in UBNA's motion.

In response to the motion for summary disposition, appellants filed a brief that essentially mirrored the substance of the allegations in the counterclaim and third-party complaint, absent the numbered paragraphs, and structured in a form suitable for summary disposition. On the strength of their claims of possible registration and securitization shortcomings of the PSA-created trust, UBNA's alleged lack of capacity to accept a mortgage assignment after the PSA's closing date, and UBNA's supposed violation of the loan workout plans, appellants argued that they had stated valid defenses, that UBNA was not entitled to judgment as a matter of law, and that appellant Miller had established valid causes of action in her counterclaim and third-party

---

[12] MCL 566.132(2) provides in pertinent part:

> An action shall not be brought against a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution:
>
> . . .
>
> (b) A promise or commitment to renew, extend, modify, or permit a delay in repayment or performance of a loan, extension of credit, or other financial accommodation.

complaint. Appellants argued that they were entitled to summary disposition under MCR 2.116(I)(2).

The trial court heard oral arguments, and subsequently issued a written opinion. The trial court denied UBNA's motion for summary disposition under MCR 2.116(C)(9) (failure to state a valid defense), finding that appellants had adequately *stated* valid defenses in their list of affirmative defenses that theoretically could preclude the relief sought by UBNA. The trial court next addressed appellants' argument that UBNA lacked the capacity to accept a mortgage assignment in 2005 due to noncompliance with the PSA's closing date. The court concluded that UBNA held both the note and the mortgage and that appellants lacked standing, as outside parties to the assignment itself (Provident Bank to UBNA), to challenge the assignment of mortgage, where there was no risk of appellants having to pay twice on the debt. The trial court then moved on to the claim of entitlement to participate in the HAMP and to a loan modification agreement in light of the 2009 loan workout plans. The trial court first ruled, citing some federal opinions in support, that the HAMP did not create private causes of action, nor did it impose any legal duties, such that a related tort claim could be pursued. The trial court additionally concluded that the statute of frauds, MCL 566.132(2), barred any type of contractual claim arising from the loan workout plans or TPP, where UBNA did not sign the plans. Further, the trial court found that "[t]here [was] no evidence in the record that all required payments under the . . . TPP agreement were made, or even that the payment indicated by the [Litton] letter was ever processed." The trial court ruled that there was no compliance with the loan workout plans or TPP, assuming their validity. On the basis of the conclusions, rulings, and findings above, the trial court granted UBNA's motion for summary disposition in its entirety under a combination of MCR 2.116(C)(8) and (10).

At this juncture, appellants filed a claim of appeal in this Court. The trial court subsequently entered a judgment of foreclosure and sale. The judgment held appellants liable in the amount of $543,920 and provided that if said amount was not paid within 21 days of the judgment's entry, the encumbered property was to be sold at a sheriff's sale.

## II. ANALYSIS

### A. STANDARD OF REVIEW

This Court reviews de novo a trial court's ruling on a motion for summary disposition. *Elba Twp v Gratiot Co Drain Comm'r*, 493 Mich 265, 277; 831 NW2d 204 (2013). We also review de novo a trial court's ruling on equitable matters or doctrines. *Blackhawk Dev Corp v Village of Dexter*, 473 Mich 33, 40; 700 NW2d 364 (2005); *Knight v Northpointe Bank*, 300 Mich App 109, 113; 832 NW2d 439 (2013). Likewise, this Court reviews de novo the existence and proper construction of a contract, such as a mortgage or mortgage assignment. *Graves v American Acceptance Mtg Corp (On Rehearing)*, 469 Mich 608, 613; 677 NW2d 829 (2004); *Archambo v Lawyers Title Ins Corp*, 466 Mich 402, 408; 646 NW2d 170 (2002); *Kloian v Domino's Pizza, LLC*, 273 Mich App 449, 452; 733 NW2d 766 (2006). Finally, we review de novo questions of law generally, *Oakland Co Bd of Co Rd Comm'rs v Mich Prop & Cas Guaranty Ass'n*, 456 Mich 590, 610; 575 NW2d 751 (1998), including the issue of a party's standing, *Mich Citizens for Water Conservation v Nestle Waters North America Inc*, 479 Mich

-8-

280, 291; 737 NW2d 447 (2007), overruled in part on other grounds in *Lansing Schs Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 378; 792 NW2d 686 (2010).

## B. SUMMARY DISPOSITION TESTS

MCR 2.116(C)(8) provides for summary disposition when a complaining party fails "to state a claim on which relief can be granted." A motion for summary disposition under MCR 2.116(C)(8) tests the legal sufficiency of a complaint. *Beaudrie v Henderson*, 465 Mich 124, 129; 631 NW2d 308 (2001). The trial court may only consider the pleadings in rendering its decision. *Id.* All factual allegations in the complaint must be accepted as true. *Dolan v Continental Airlines / Continental Express*, 454 Mich 373, 380-381; 563 NW2d 23 (1997). "The motion should be granted if no factual development could possibly justify recovery." *Beaudrie*, 465 Mich at 130.

MCR 2.116(C)(10) provides for summary disposition when "there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, depositions, affidavits, and other documentary evidence, which must be considered by the court and then viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996), citing MCR 2.116(G)(5). Initially, the moving party has the burden of supporting its position with documentary evidence for purposes of a summary disposition motion under subrule (C)(10). *Quinto*, 451 Mich at 362; see also MCR 2.116(G)(3)(b). And MCR 2.116(G)(4) provides:

> When a motion under subrule (C)(10) is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, judgment, if appropriate, shall be entered against him or her.

"A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). A motion brought under MCR 2.116(C)(10) tests the factual support for a party's claim. *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013). The trial court is not allowed to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not proper to grant a motion for summary disposition under MCR 2.116(C)(10). *Id.* A court can only consider substantively admissible evidence actually proffered with respect to a motion for summary disposition brought pursuant to MCR 2.116(C)(10). *Id.*

## C. JUDICIAL FORECLOSURE

This case concerns judicial foreclosure, which is governed by MCL 600.3101 *et seq.*, as opposed to foreclosure by advertisement, MCL 600.3201 *et seq.* Actions for judicial foreclosure under Chapter 31 "are equitable in nature." MCL 600.3180. MCL 600.3115 provides:

Whenever a complaint is filed for the foreclosure or satisfaction of any mortgage on real estate or land contract, the court has power to order a sale of the premises which are the subject of the mortgage on real estate or land contract, or of that part of the premises which is sufficient to discharge the amount due on the mortgage on real estate or land contract plus costs. But the circuit judge shall not order that the lands subject to the mortgage be sold within 6 months after the filing of the complaint for foreclosure of the mortgage[.]

"In the original judgment in foreclosure cases the court shall determine and adjudge which defendants, if any, are personally liable . . . for the mortgage debt[,] [and] [t]he judgment shall provide that upon the confirmation of the report of sale that if either the principal, interest, or costs ordered to be paid, is left unpaid after applying the amount received upon the sale of the premises, the clerk of the court shall issue execution for the amount of the deficiency[.]" MCL 600.3150.

## D. DISCUSSION

As an initial observation, we find that appellants' arguments on appeal are generally repetitive, undeveloped, unsupported by documentary evidence, and at times difficult to discern. We take note of and heed the following statement by our Supreme Court in *Mudge v Macomb Co*, 458 Mich 87, 105; 580 NW2d 845 (1998):

"It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow." [Citation omitted.]

### 1. REGISTRATION AND SECURITIZATION

Appellants first argue that UBNA was the trustee of the PSA-created trust "that may or may not have been registered with and securitized by the [SEC] or registered with the State of Michigan."[13] This is a self-acknowledged speculative argument ("may or may not") that appellants never supported with any documentary evidence, that appellants never developed within an analytical framework, with citation of applicable authorities, and that appellants never connected to a legal rationale that would undermine or circumvent UBNA's foreclosure efforts. The argument is effectively waived due to inadequate briefing. We also note that SEC filings, of which we have taken judicial notice, MRE 201, belie appellants' argument with respect to

---

[13] In general, the term "securitize" means "[t]o convert (assets) into negotiable securities for resale in the financial market, allowing the issuing financial institution to remove assets from its books, to improve its capital ratio and liquidity while making new loans with the security proceeds." *Black's Law Dictionary* (7th ed).

registration and securitization by the SEC, as the filings appear to fully recognize the 2002 PSA, the related trust, and UBNA's status as the trustee. Reversal is unwarranted.

## 2. COMPLIANCE WITH THE PSA AND UBNA'S CAPACITY TO BE AN ASSIGNEE OF THE NOTE AND MORTGAGE

Appellants next argue as follows:

> [UBNA] has failed to establish that it has followed the terms of the PSA in that the closing date of the Trust was in 2002. The mortgage for the subject property ultimately transferred into the Trust after the closing date which is a prerequisite to capacity. [UBNA] . . . does not have the legal authority, ownership, capacity or privity to maintain the subject property.

The relevant assignment of the mortgage and note to UBNA was signed on October 27, 2005, and recorded on November 8th of that year. As discussed earlier, appellants appear to be arguing that UBNA lacked the capacity to act as an assignee of the mortgage and note in 2005, given that the governing 2002 PSA effectively closed the trust in late March 2002, such that mortgages and notes thereafter could not be assigned or flow to the trust or trustee. As reflected earlier in this opinion, in a request for admissions served by appellants on UBNA early in the litigation, appellants asked UBNA to "[a]dmit that the closing date to transfer all mortgages to the Trust was March 27, 2002." And UBNA responded:

> On information and belief, Plaintiff believes that the pooling and servicing agreement references a closing date of March 27, 2002[,] but denies that the relevant section of the document states that all mortgages must be transferred by that closing date. Plaintiff cannot fully admit or deny this request as Defendants did not provide the relevant portions of the document(s) necessary to respond. Plaintiff continues to investigate and will supplement this response as necessary.

Again, the record does not reflect that appellants or UBNA ever followed up with respect to the 2002 PSA, and the PSA is not contained in the record. Appellants never sought discovery or production of the 2002 PSA. Given the evidence of the 2005 assignment, the affidavit by Ocwen's officer averring that UBNA held the note and mortgage, and considering UBNA's answer to the admissions request effectively denying that the PSA precluded the 2005 assignment and conveyances, absent any supplementation of the answer to the contrary, if appellants wished to create a factual dispute regarding UBNA's capacity to be an assignee in 2005, they had the burden to produce conflicting evidence on the subject. Appellants failed to produce such evidence, and indeed appellants failed, aside from the unexplored admissions request, to even attempt to procure evidence sufficient to create a factual dispute on capacity. Accordingly, reversal is unwarranted.[14]

---

[14] We find it unnecessary to reach UBNA's argument that appellants lacked standing to challenge its capacity to accept the 2005 assignment of the note and mortgage, where neither

### 3. THE LOAN WORKOUT PLANS AND RELATED TPP AND THE HAMP

Appellants next contend that UBNA violated the 2009 loan workout plans and TPP and that they were entitled to participate in the HAMP and to a loan modification agreement, thereby precluding foreclosure. Appellants claim to have met or satisfied the criteria and requirements of the loan workout plans and TPP; however, there is an absolute dearth of evidence showing compliance with the plans. Assuming appellants could overcome the fact that neither UBNA nor Litton signed the plans, as required by the applicable statute of frauds, MCL 566.132(2), based on an estoppel or part-performance argument given Litton's letter to David Carswell suggesting the existence of an actual agreement under the plans, there was no evidence of compliance with appellants' obligations under the plans.

Both of the 2009 loan workout plans, which were expressly characterized as representing the first step of a two-step documentation process, specifically provided that appellants' right to participate in the HAMP and to obtain a loan modification agreement was dependent on their compliance with the plans and the TPP. At the very most, the plans created a contract with a condition precedent that had to be satisfied before a duty to enter into an actual loan modification agreement arose on the part of UBNA or Litton, and the condition precedent was simply not satisfied. In *Harbor Park Market, Inc v Gronda*, 277 Mich App 126, 131; 743 NW2d 585 (2007), this Court explained that a condition precedent is an event or fact that the parties intend must occur before there is a contractual right to performance. And if the condition is not satisfied, there is no cause of action for a failure to perform the contract. *Id.* Here, appellants were not permitted to simply rely on their pleadings that claimed compliance with the loan workout plans and the TPP's payment obligations in the face of UBNA's claims and documentary evidence supporting foreclosure. MCR 2.116(G)(4). Appellants could have easily submitted receipts, canceled checks, or some other form of documentation proving that the TPP payments were made – a condition precedent – had they actually been made, which clearly was not the case. Appellants did not even exercise the option of submitting self-serving affidavits on the issue; a wise decision if there was no compliance with the plans. In sum, appellants failed to create a genuine issue of material fact regarding the claimed entitlement to a loan modification

---

appellant was a party to the assignment. We do note that in *Bowles v Oakman*, 246 Mich 674, 677-678; 225 NW 613 (1929), our Supreme Court ruled, in part, that "[a] [note] maker, when sued on such instrument, may defend on the ground that the plaintiff is not the owner of the instrument [and] does not have legal title to it, for the reason that the maker has a right to insist that he pay his obligation but once, and hence to the true owner." *Bowles* also indicated that a maker of a negotiable note, the obligor, generally lacks standing to litigate issues that concern the rights and obligations of the holder of the note and a purported assignee. *Id.* at 678-680. The trial court here alluded to the principles in *Bowles* when it found a lack of standing on the bases that neither appellant was a party to the challenged assignment between UBNA and Provident Bank and that there was no risk of appellants having to pay twice on the note or debt. The trial court also relied on an unpublished Sixth Circuit opinion, while acknowledging that the opinion did carve out an exception to the "lack of standing" rule when a note's obligor asserts that an assignment was invalid or ineffective. Although we question the trial court's analysis on the standing issue, we again decline to rule on the matter.

agreement and participation in the HAMP.[15]  Accordingly, appellants' argument that they established a breach of contract that could serve as a cause of action and as a defense to the foreclosure is unavailing.

## 4.  APPELLANTS' ADDITIONAL ARGUMENTS

In cursory fashion, appellants argue that there were viable defenses and claims of tortious breach of contract, bad-faith breach of contract, and breach of the implied covenant of good faith and fair dealing relative to a contract.  All of these claims are directly tied to the issue of appellants' contractual demand for a loan modification agreement and participation in the HAMP, as predicated on the loan workout plans and the TPP.  Our discussion, analysis, and ruling in the preceding section of this opinion effectively dispose of each of these contract-related claims and further analysis is unwarranted.

## III.  CONCLUSION

The trial court did not err in granting summary disposition in favor of UBNA with respect to UBNA's complaint for foreclosure and appellant Miller's counterclaim.  We note that there is no order in the lower court record that specifically granted summary disposition in favor of Litton on Miller's third-party complaint.  However, it is clear from the trial court's extensive written opinion and order that it encompassed and disposed of the third-party claims against Litton.  And our opinion and holding equally extends to Litton.

Affirmed.  Having fully prevailed on appeal, UBNA and Litton are awarded taxable costs pursuant to MCR 7.219.

/s/ Michael J. Talbot
/s/ William B. Murphy
/s/ Elizabeth L. Gleicher

---

[15] The trial court also correctly observed that a slew of federal decisions have held that the HAMP itself does not give rise to rights that can support a private cause of action.  See *Wigod v Wells Fargo Bank, NA*, 673 F3d 547, 559 n 4 (CA 7, 2012) ("Courts have uniformly rejected these claims because HAMP does not create a private federal right of action for borrowers against servicers.").