### WOODS v. CHALMERS MOTOR CO.

1. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—INFERENCES FROM TESTIMONY TO BE DRAWN BY JURY.

    In an action for the destruction of plaintiff's houseboat by fire caused by an explosion on defendant's premises, any inference that plaintiff's husband appreciated the danger and was guilty of contributory negligence that could be drawn from his testimony that he had been aware for a few days that gasoline was escaping from defendant's premises onto the ground and a scum was forming on the surface of the water around his houseboat, and that he was looking for another location, *held*, for the jury rather than the court.[1]

    [1]The question of liability of one for injury caused by escape of dangerous substance stored on his premises, is discussed in a note in 15 L. R. A. (N. S.) 535.

2. SAME—EXPLOSIVES—DEGREE OF CARE REQUIRED.

In storing upon its premises and handling for its purposes large quantities of gasoline, defendant was bound to exercise such reasonable care to avoid accident as was commensurate with the apparent dangers attending such use.

3. SAME—PROOF—INFERENCES—QUESTION FOR JURY.

While the burden was upon plaintiff to prove facts from which it might be fairly inferred that defendant's negligence was the proximate cause of the explosion, the evidence need not be direct and positive; proof sufficient to give room for a reasonable inference, or permissible presumption, of negligence on the part of defendant being sufficient to carry the case to the jury.

4. SAME—EVIDENCE—QUESTION FOR JURY.

Contradictory testimony as to whether defendant permitted gasoline to overflow and run at large, and to what extent, rendered the question of its negligence one for the jury.

5. SAME—INFERENCES—QUESTION FOR JURY.

Even if there were no conflict in the testimony, if different inferences might reasonably be drawn as to its import, the question as to whether there was negligence would still be for the jury.

Error to Wayne; Tappan, J., presiding. Submitted June 13, 1919. (Docket No. 66.) Decided December 22, 1919.

Case by Anna Woods against the Chalmers Motor Company for the negligent burning of plaintiff's houseboat. Judgment for plaintiff. Defendant brings error. Affirmed.

*Clark, Emmons, Bryant, Klein & Brown,* for appellant.

*Charles A. Lorenzo (Clifton G. Dyer,* of counsel), for appellee.

STEERE, J. On October 16, 1916, plaintiff was living with her husband in a houseboat moored in Connor's creek near its mouth adjacent to land belonging

to the city of Detroit, through the easterly part of which said creek flows. On that date the houseboat was destroyed by a fire resulting from an explosion in defendant's nearby factory. Plaintiff's husband assigned to her all his right, title and interest in the houseboat and its contents together with all demands for damages by reason of its destruction and she thereafter brought this action against defendant in the circuit court of Wayne county. From a verdict and judgment in her favor for $1,644, found by a jury to be the value of the property so destroyed, defendant has brought the case to this court for review upon various assignments of error all directed, as stated in its counsel's brief, to these two questions:

"1. Was the defendant entitled to a directed verdict on the ground that the plaintiff had failed to show that the defendant was guilty of such negligence as would permit recovery? And

"2. Was the plaintiff guilty of such contributory negligence as bars recovery in this case?"

Defendant's claimed right to a directed verdict was presented and preserved for review by motion, requests and motion for a new trial, with exceptions to the trial court's rulings thereon, it being urged and argued that the record contains no testimony showing the cause of the explosion nor any negligent act or omission on defendant's part; and that plaintiff's husband negligently kept their houseboat moored where oil and greasy scum floated around it and they well knew whatever dangerous conditions existed.

Connor's creek curves in its southerly course through Detroit at a point near where it crosses Clairpointe avenue south of Jefferson, running thence in a southwesterly direction to the Detroit river. Along its shores in that locality are located a number of manufacturing establishments. Defendant's factory property extends southerly from Jefferson avenue to Connor's

creek with a number of large buildings upon it. Near its easterly limits is a long four-story factory building containing the heat treating department, to which is connected a one-story building used by the block testing department, located next to and abutting on Connor's creek. Close to the latter building on the northeast lies land owned by the city of Detroit known as the garbage plant property. Plaintiff's houseboat was moored to the shore in front of the city property, about 50 feet from defendant's one-story building of the block testing department in which motors manufactured and assembled elsewhere were tested. The two buildings were adjacent, and "connected by an opening in the steel aperture or door," as defendant's manager described their proximity.

Connor's creek is a sluggish stream at its mouth practically on the level of Detroit river into which it empties. On the day in question there was no perceptible current near its mouth, and a considerable quantity of oil and oily scum was floating upon its surface in that locality, held back by the wind which was then blowing up stream. That portion of the creek was quite commonly used as a place for mooring houseboats, especially in the fall, and on the day in question three were anchored not far from plaintiff's.

Gasoline was used by defendant in its block testing department to run the motors, which were placed on blocks or iron cradles for examination and testing, oil being also used to lubricate and function them. A supply of gasoline was stored in the yard on the west side of the building in a sunken tank having a capacity of about 12,000 gallons. For use it was first drawn from the large sunken storage tank by a vacuum pump system into a smaller gravity tank with a capacity of three or four barrels, located close to the side of the building. The overflow from this tank ran, as claimed by defendant, back into the submerged

tank. Plaintiff claimed this overflow did not all re-
turn to the larger tank but quantities escaped into
a small depression in the ground, or ditch, extending
from the building to Connor's creek. The gasoline
was piped from the small tank to the motor stand and
released to the motors by pet-cocks. There was testi-
mony that almost daily escaping gasoline, oil and
water drained into Connor's creek along the small open
ditch, and in places it could be seen standing in pools.
There was also a sewer running from under the south-
east corner of the test building to the creek. At about
5 p. m. of the day in question, just when the motor
testing work had shut down and the quitting em-
ployees of that department were punching the clock
preparatory to going home, there was a heavy explo-
sion under that end of the building which blew off
the covers of man-holes of a trench or sewer system,
including one just outside the building. Simultane-
ously with this explosion flames burst out of the build-
ing and the oily surface of Connor's creek was set
aflame. At the same time plaintiff's houseboat was
listed over by the explosion, caught fire, and burned
so rapidly that plaintiff, who was thrown off her feet
by the shock, had difficulty in escaping. Her husband
was away from home at his daily employment when
this took place and some men who ran down to the
shore rescued her. She testified of this:

"Between the time of the explosion and the time I
discovered the house was on fire I didn't have time
only to run for my life on the front deck, and when
I got on the front deck of the boat the escape was cut
off. Mr. Thompson and this other man had risked
their lives to take me off, * * * I had two cats
burned, they couldn't get off."

The negligence imputed by plaintiff to defendant is
that it carelessly failed to keep its oils, gasoline and
other dangerous combustibles safely stored upon its

own premises and negligently permitted the same to escape upon its own premises, and into Connor's creek; that it employed unskilled persons to handle and use the same, and—

"did negligently and wilfully cause a large quantity of oils, gasoline and other highly dangerous combustible substances to become ignited and to explode which escaped from its premises to plaintiff's said boathouse setting fire thereto and destroying the same together with all its contents," and "did also communicate to the oils, gasoline and other inflammable matters then accumulated on the surface of said Connor's creek near and about said boathouse, which also exploded and set fire to said boathouse, destroying same together with its contents," etc.

Defendant's contention that plaintiff was as a matter of law guilty of such contributory negligence as precludes recovery is directed to the claim that she and her husband with knowledge of conditions kept their houseboat moored in a manifestly unsafe location where oils, greasy scum, etc., had accumulated upon the surface of the water around it, the danger being, it is asserted, "appreciated by plaintiff's husband, who testified that he was so concerned over the situation that he was looking for a place to move, and that he had known this for some time at least before the fire and explosion."

The record scarcely sustains this version of his testimony. Thomas Woods, plaintiff's husband, had known and been around that portion of Connor's creek "off and on" for 17 or 18 years. It was navigable, sheltered water for some distance above its mouth and much used by rowboats, launches, and houseboats. He built their houseboat in 1914. It contained several rooms, was comfortably furnished and fitted up as a home for himself and wife. They had there the usual household goods, comforts and conveniences of

a modest home, including customary furniture, culinary utensils, a sewing machine, rugs, draperies, silverware, etc., with various other articles of use and modest luxury, including a phonograph and two cats. Plaintiff testified to having been married 33 years and that they had lived on board their houseboat for over three years. It had been moored abreast the city property where it burned for some time, just how long is not shown. Her husband worked nights at the Michigan Central station, going on duty at 4 p. m., and was called home by telephone shortly after the fire. He had recently noticed and apparently been annoyed by fumes of gasoline, and planned to find a more agreeable location. His testimony on the subject is as follows:

"*Q.* Did you have occasion to observe the condition of the surface of the water when you left? (On the day of the fire.)

"*A.* Yes, sir, I was trying to find a location to get out from the fumes of gasoline.

"*Q.* Because—

"*A.* On account of the fumes of gasoline.

"*Q.* You were doing what?

"*A.* Looking for a location to move.

"*Q.* When did you first notice those fumes?

"*A.* Sunday morning when I came home, which would be Sunday about 3 o'clock in the morning."

Other houseboats were moored close by. He does not testify that in his purpose to move he was actuated by any thought or appreciation of danger from explosion or fire. If his testimony permits that inference, it was for the jury rather than the court.

This is not a case where a plaintiff is shown or claimed to have been at default in some defined duty in regard to a danger of which he had knowledge. It is said in 29 Cyc. p. 640:

"The fact that the person injured was aware of the danger is not sufficient to render him guilty of con-

tributory negligence as matter of law, but the question should be submitted to the jury."

Amongst the authorities cited in support of this text is *Brezee* v. *Powers*, 80 Mich. 172, in which it is said:

"Where the essential fact in a case is whether contributory negligence did or did not exist, and this depends upon inferences to be drawn from facts and circumstances about which honest, intelligent and impartial men might differ, such a case should be submitted to the jury."

The trial court did not err in submitting the question of plaintiff's contributory negligence to the jury nor in the charge upon that subject.

Not denying that there was an explosion in defendant's building with an outburst of flames, in the air and on the water, which set fire to and destroyed plaintiff's houseboat, defendant's further contention is that a directed verdict should have been granted in its behalf for the reason that no presumption of negligence arises from the bare fact of an explosion, and the record is destitute of testimony showing any negligent act or omission on its part causing or contributing to the explosion.

The court charged the jury that no presumption of defendant's negligence arose from the bare proof of an accident or explosion on its premises, that the burden of proving freedom from contributory negligence on her and her husband's part, and negligence on defendant's part causing the injury complained of rested upon plaintiff. If right in the assumption that the testimony viewed in its most favorable light for plaintiff, which is the recognized test, raised an issue of fact for the jury, the charge is not otherwise complained of, as we understand the position of counsel, nor open to criticism.

Counsel for defendant cite as analogous in facts and particularly in point here, *Cosulich* v. *Standard*

*Oil Co.*, 122 N. Y. 118 (25 N. E. 259). In that case plaintiff's vessel was lying at a wharf in Newton creek, King's county, N. Y., next adjacent to defendant's wharf and premises on which it conducted a petroleum refinery, where some oil caught fire from an explosion and while burning a quantity of it ran down a pipe leading to a lighter lying at its wharf loaded with petroleum. The lighter exploded and set fire to plaintiff's vessel at the adjoining dock some 20 feet away. Although quite analogous in its general outlines, that case does not impress us as particularly helpful to the present inquiry, for the principles of law applied to the undisputed facts in that case are conceded here. The opinion is a long one, dealing with many negligence cases involving explosions and similar accidents. It is somewhat peculiarly commented on by Judge Thompson in his work on negligence with the concluding reflection:

—"but a great many judges forget the limitations of their own power and perform the functions of jurors in actions at law for damages, in this way." 1 Thompson on Negligence, note to section 763.

Be that as it may, the essence of the long decision in facts and law as disposed of appears in the following excerpts:

"The plaintiffs proved simply an explosion. The inference is perhaps permissible that the subject of the explosion was the receptacle described as a boiler, tank, still or agitator, although no witness pretends to assert that it was destroyed or torn down. If it may be inferred that it was the tank the evidence is silent as to the cause. * * * he who alleges injury sustained through the negligence of his neighbor, with whom he has no contract relation and who owes him no other duty than that he shall observe reasonable care to prevent injury, must prove the facts from which an inference of the particular act of negligence charged can be drawn."

Here facts were proved beyond simply an explo-

sion, from which plaintiff claims and defendant denies the inference of negligence can be drawn. The facts upon which plaintiff relies are scattered through the testimony in a more or less fragmentary way, of claimed varying significance, full understanding of which an examination of the entire record might best subserve, but we can only note certain significant items of testimony which at least distinguish this from the *Cosulich Case.*

Defendant used large quantities of gasoline in its testing department taken from a storage tank of 12,-000 gallons capacity sunken in the yard near by. It was elevated from there by a vacuum pump into a gravity tank just outside the building with a capacity of three or four barrels, from which the gasoline passed by gravity through piping to the motors. The gravity tank was elevated so as to keep a 10 or 12 foot head on the motors. On that side was an open ditch about 16 inches wide leading along the building from the creek for about 60 feet to where, as a witness states, "it got out of the building to an outlet." From 55 to as high as 100 motors a day were tested in the building, supplied with gasoline from the small gravity tank by the wall outside. Carl C. Hinkley, defendant's work manager and engineer, testified the vacuum pump supplying gasoline from the sunken storage tank pumped continually—"all the time," the overflow running back into the big tank, and "in taking out gasoline for motors there was a third pipe." Plaintiff contended and introduced testimony to show that the overflow was not properly cared for and safely returned to the big storage tank but quantities of gasoline were negligently permitted to overflow from the small elevated gravity tank to the ground, spreading into the open ditch and standing in pools, creating a condition which was in effect a dangerous nuisance. This was an issue of fact for the jury, of which Hinkley said when making denial of the fact:

—"it would be highly dangerous to have a surplus, so many motors you know. For instance, if there was considerable gasoline permitted to accumulate around the premises, it would be highly dangerous, so many motors, you know. If gasoline was allowed to accumulate around the premises, it would be dangerous. I know where the ditch was on the outside of the premises that day. If that ditch was filled with gasoline or partly filled or if it had any gas in it, at all, there would be a certain amount of vapor always present. There would be a certain amount present if used with lubricating oil. * * * If gasoline was present there would be also gasoline action in the ditch. It is obvious that the greater the quantity, the greater the gasoline action. I should imagine if there was sufficient gasoline saturating the air it would ignite if it came in contact with flame."

An apparently disinterested witness named Thompson, who worked for the city at the garbage grounds adjoining defendant's property and was near by at the time of the explosion, testified:

"I have seen this tank overflow for hours at a time. Gasoline came out of it. The gasoline would flow on the ground, lay there in a pool and run off into the creek. Some of it remained in that pool. This was not protected in any way. * * * I saw the can run over day after day. * * * There is a little ditch running all the way through where this stuff comes out of the tank in this ditch, * * * I have seen gasoline and oils in this ditch; I saw this on the 16th of October, 1916. There was oil and gasoline in it. * * * There was quite a little bit in it, water and gasoline and oil together. The bottom of the ditch was covered with it. The ditch was probably 16 inches wide, just a narrow little gutter down to drain it. There was a flat hole, little trap running from the edge of the hole to the ditch and the flat hole was full. * * * I was down near where the sewer empties into the stream on the day in question. I saw oil and water coming out of it, right at the corner of the Chalmers building. * * * It was quite a little stream running there."

Of the explosion Thompson said in part:

"I was standing in the barn door and was looking in that direction. The explosion took place about the middle of the building. About the time of the explosion the air was on fire, gasoline oil or something going out of all the windows over there. The flames came from the Chalmers plant. I saw the burning flames in the air. The burning flames lit on the houseboat of the Woods. Prior to the explosion I did not see any flames around the houseboat. I was looking in that direction. After the explosion I saw flames light on the houseboat and saw the houseboat afire."

Another witness near by who ran out on hearing the explosion to see what had happened said in part:

"I jumped up quick and ran outside and when I got outside everything was afire. The houseboat was afire. It was all over the houseboat, right around where the boat lay and kept working up further because Mr. Benowski had all he could do to get his boat out of the way. * * * There was fire inside the Chalmers plant. I saw fire coming out of the manhole at the 'foundation of the one-story building. I saw flames coming from the inside of the building. * * * The point where the fire came out of the manhole there was about in the center of the one-story building."

Outsiders testified to two apparent drainages from the test block building, a sewer from the southeast corner and an open ditch on the side of the building towards the garbage plant. It also appeared from Hinkley's testimony there was some kind of a tunnel system under the building. He said he would "judge the tunnels are about 20 inches wide and 3 feet deep"; that they were "just a trench system from the block test" and not a part of the sewer system; that the only water which ran out of the sewer at the southeast corner was waste water from cooling the engines, and the only oil which could pass out with it "would be the lubricating oil that was backed up by the water

in flushing out the circulating system of the engines."
He stated "the tunnel had an outlet to the outside."
Asked where the tunnels, or trench system, emptied he
replied, "as near as I can recall, it emptied into the
ditch that you referred to and ran down to the creek."
He also said that there were manholes in the tunnel
system under the floor, and at the time of the explo-
sion "the motors that were over the manholes were
elevated and tipped over, causing the damage." In ex-
planation of his failure to remember to whom he re-
ported the accident, and whether his report was in
writing, he offered the reflection that "the manage-
ment was changing quite rapidly at that time."

Without further prolonging reference to other items
of testimony of similar import which might be noted,
we conclude it can be fairly maintained from the rec-
ord that there is much more shown in this case from
which it is possible to infer negligence than the bare
fact of an explosion. Negligence is absence or want
of ordinary care. In storing upon its premises and
handling for its purposes large quantities of gasoline,
defendant was in duty bound to exercise such reason-
able care to avoid accident as was commensurate with
the apparent dangers attending such use. While the
burden was upon plaintiff to prove facts from which
it might be fairly inferred defendant's negligence was
the proximate cause of the explosion and her injury,
the evidence need not be direct and positive. Negli-
gence in a given cause may be susceptible of proof
only by circumstances pointing more or less directly
to the ultimate fact charged. To carry the case to
the jury plaintiff was only bound to prove sufficient to
give room for a reasonable inference, or permissible
presumption, of negligence on the part of defendant
to her damage.

It is urged for defendant there is practically no
conflict in the evidence and therefore "the decision

of the case becomes a question of law, and not of fact for the jury." We are impressed the testimony cannot be counted harmonious upon whether, or the extent, gasoline was permitted to overflow and run at large from the gravity tank upon and over the ground to gather in pools, or in the ditch connected with tunnels under the testing building; but were the testimony not in conflict, if different inferences might reasonably be drawn as to its import, it does not follow the case should be disposed of as a matter of law.

"It is also the general rule that the mere fact that an injury has resulted from certain conduct does not establish the further fact that the conduct was negligent, and we may add a third rule, stated by counsel, which is that although the facts concerning the conduct complained about are not in dispute, if different minds may honestly draw different conclusions respecting them, the question whether there was negligence is still a question for the jury." *Brown* v. *Bryant,* 166 Mich. 180.

We regard as well in point and applicable here the principles applied in *Schoepper* v. *Chemical Co.,* 113 Mich. 582, involving an explosion of nitro-glycerine, the cause of which defendant contended rested entirely in conjecture. As was said there in conclusion:

"Negligence, like any other fact, may be inferred from circumstances. (Citing cases.) And, though the proof of plaintiff depended upon inference to establish the main fact, the question of whether the inference suggested by the plaintiff's theory is the correct one, or whether it was sufficiently rebutted, was for the jury." (Citing cases.)

The judgment will stand affirmed.

BIRD, C. J., and MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.

The late Justice OSTRANDER took no part in this decision.