# STATE OF MICHIGAN

# COURT OF APPEALS

RICHARD HOWARD, REED HOWARD, and
GERALDINE REED,

      Plaintiffs-Appellants,

and

K. DON REED

      Plaintiff

v

GLENN HAVEN SHORES ASSOCIATION,

      Defendant-Appellee.

UNPUBLISHED
July 26, 2018

No. 340174
Allegan Circuit Court
LC No. 13-052490-CH

Before: HOEKSTRA, P.J., and MURPHY and MARKEY, JJ.

PER CURIAM.

Plaintiffs appeal as of right the trial court's order granting summary disposition in favor of defendant Glenn Haven Shores Association (the Association) under MCR 2.116(C)(8) and (10) in this action involving claims of negligence and nuisance arising out of the erosion of plaintiffs' Lake Michigan properties, allegedly caused, for the most part, by surface water flowing over the crest of a bluff and ravine. The trial court ruled that the Association did not owe plaintiffs a legal duty to prevent the erosion. We hold that the Association as an adjacent property owner owes a duty in tort to plaintiffs to act reasonably in light of apparent risks. The question in this case actually concerns the standard of conduct required to satisfy that duty or, stated otherwise, we must determine the scope of the duty owed by the Association to plaintiffs. We hold that the standard of conduct required of the Association, or the scope of its duty under tort law, does not entail taking affirmative measures to prevent or minimize erosion affecting plaintiffs' parcels. However, we further hold that the standard of conduct required of the Association, or the scope of its duty under tort law, does include refraining from engaging in negligent conduct that diverts or increases the natural flow of surface water so as to cause erosion of plaintiffs' lots beyond any erosion that would have occurred as a result of the natural flow of surface water. Keeping these principles in mind, although plaintiffs' complaint was barely adequate to survive summary disposition under MCR 2.116(C)(8), plaintiffs did not present evidence sufficient to create a genuine issue of material fact for purposes of MCR 2.116(C)(10). Accordingly, we affirm.

-1-

Plaintiffs[1] own numerous lots in the Glenn Haven Shores subdivision, formerly known as Hollywood by the Lake, a platted community that was dedicated in 1925. The subdivision is located along the shores of Lake Michigan and north of South Haven, and plaintiffs are members of the Association. Mrs. Reed owns lots 4, 5, 6, and 7, which are adjoining lakefront parcels situated east of Lake Michigan on a north-south plain, with lot 7 located furthest south.[2] Bordering these properties to the east is an Association roadway, Lakeview Terrace, and directly on the east side of the roadway are non-lakefront back lots 7, 8, 9, 10, and 11, which are also owned by Mrs. Reed, with lot 7 situated furthest south. An east-west road owned by the Association, Lake Forest Drive, borders Mrs. Reed's backlot 7 to the south, and the west end of Lake Forest Drive forms a T-intersection with Lakeview Terrace. The Howards own adjoining lakefront lots 1, 2, and 3, lying east of Lake Michigan on a north-south plain, with lot 3 located furthest south and abutting Mrs. Reed's lot 4. Of these three lakefront parcels owned by the Howards, lot 1 is located furthest north, at which point the subdivision lots veer away from Lake Michigan on a northeasterly angle, with Lakeview Terrace curving in a similar northeasterly path, providing access to those non-lakefront parcels, of which adjoining lots 5, 6, 7, 8, 9, 10, and 11 are owned by the Howards. Lot 5 is located furthest to the northeast and away from the lake. Bordering the Howards' lots 5-11 to the northwest is a ravine, and as one moves down the ravine in a southwesterly direction headed toward Lake Michigan, the ravine gives way to a bluff located east of and overlooking the beach and lake.[3] This beach bluff is situated on the west side of lakefront lots 4-7 owned by Mrs. Reed, lakefront lots 1-3 owned by the Howards, and lakefront lots 8-11 owned by the Association. An area that is designated as outlot 9, a common area owned by the Association, is essentially a beachfront buffer between the lake and the lakefront lots, along with capturing an area northwest of the ravine lots and the ravine. The bluff and the ravine together partially encircle plaintiffs' properties. As reflected in a survey map relied on by the parties, the bluff overlooking the beach and Lake Michigan has been eroding away in an easterly direction, eating into the west side of the lakefront lots, and the ravine has been eroding away in a southeasterly direction, consuming the northwest side of the ravine lots.[4] Plaintiffs have owned the parcels for many years, with the first lots being purchased in the late 1970s.

In a second amended complaint, plaintiffs alleged that the continuing erosion of the ravine and bluff was eating into their lots, with some lots losing half of their surface area. Plaintiffs asserted that sometime in the fall-winter-spring of 2015-2016, "massive erosion occurred along the bluff as a result of Lake Michigan's historic high water levels." Plaintiffs further claimed that "[t]his new erosion [was] causing the face of the bluff to drastically erode causing even more erosion to the bluff itself" and that "if this erosion continue[d], the Howards'

---

[1] Plaintiff K. Don Reed, who passed away during the proceedings below, was married to plaintiff Geraldine Reed, who is the mother of plaintiff Reed Howard, who is married to plaintiff Richard Howard.

[2] Adjacent lakefront lots 8, 9, 10, and 11, which are south of Mrs. Reed's lakefront lots, are owned by the Association and comprise an area known as Sunset Park.

[3] We shall refer to lots 5-11 owned by the Howards as the "ravine lots."

[4] Most of the Howards' home and garage sit on lots 1 and 11.

house and other property [would] collapse into Lake Michigan." Plaintiffs additionally alleged that the Association owned and controlled the bluff and ravine as common areas, that the Association had a duty to maintain the bluff/ravine so as to prevent erosion from destroying plaintiffs' parcels, that plaintiffs were powerless and could not take erosion control measures with respect to the bluff/ravine because they did not own the areas, and that "a considerable amount of erosion may be caused by runoff water from the streets or other property owned by" the Association. Plaintiffs also asserted that the Association had a duty to stop runoff from its property onto plaintiffs' lots, that the Association had a duty to maintain the bluff, ravine, streets, and other property within its ownership and control so as to avoid further erosion of plaintiffs' parcels, and that the failure of the Association to control the erosion had caused plaintiffs to suffer damages. Plaintiffs alleged counts sounding in negligence and nuisance.[5]

The Association filed a motion for summary disposition under MCR 2.116(C)(8) and (10), arguing that plaintiffs' claims of negligence and nuisance were based on the Association's alleged duty to control the erosion of plaintiffs' properties, that the Association had no duty to control any erosion on or of plaintiffs' lots, that, therefore, the negligence and nuisance counts should be summarily dismissed, and that, as an additional reason to dismiss the nuisance claim, an actionable nuisance cannot arise from a natural condition of property. In plaintiffs' response, they argued that the Association did owe them a duty as (1) the owner of common land within the Association, and (2) inherent in the performance of its undertakings. Plaintiffs maintained that their damages were not caused by the natural flow of water draining onto their lots. Rather, according to plaintiffs, numerous actions taken by the Association diverted water from its natural drainage path, causing significant damage to plaintiffs' parcels in the form of erosion.

At the hearing on the Association's motion for summary disposition, the parties and the trial court initially discussed this Court earlier opinion, with the parties and the court struggling

---

[5] In an earlier complaint, plaintiffs had alleged negligence, nuisance, and adverse possession against the Association, and the trial court granted summary disposition in favor of the Association, concluding that the negligence and nuisance claims were time-barred and that plaintiffs could not establish all of the necessary elements of adverse possession. In an appeal to this Court, the previous panel ruled that the adverse possession count was properly dismissed. *Howard v Glenn Haven Shores Association*, unpublished per curiam opinion of the Court of Appeals, issued July 7, 2016 (Docket No. 325812); unpub op at 5. This Court then held:

> Plaintiffs essentially alleged that defendant [Association] maintained the berm in a negligent manner. In turn, defendant's negligence gave rise to a nuisance—i.e. erosion. To the extent that defendant negligently maintained the berm before October 28, 2010—i.e. three years before plaintiffs filed their complaint—any damage resulting from that alleged negligence was time-barred under MCL 600.5805(10). In other words, plaintiffs cannot recover damages for erosion that occurred *before* October 28, 2010. However, to the extent that plaintiffs allege defendant continued to maintain the berm in a negligent manner after October 28, 2010, which resulted in further erosion, those claims are not time-barred under MCL 600.5805(10). . . . Therefore, the trial court erred in part when it held that plaintiffs' nuisance and negligence claims were time-barred in their entirety. [*Howard*, unpub op at 8.]

-3-

to understand the panel's discussion of a "berm" in relation to the negligence and nuisance claims. Even plaintiffs' counsel was not clear about any "berm" being relevant to the case.[6] The parties moved on to the question of duty, presenting their respective arguments. The trial court rejected an argument by plaintiffs that their relationship with the Association was analogous to a landlord-tenant relationship that would give rise to certain duties. The trial court complained that some of plaintiffs' arguments were unsupported by the documentary evidence, including a claim that a seawall built by the Association altered the flow of water. The trial court proceeded to rule:

> I don't believe that the [Association] had a duty to maintain or prevent – maintain a common area to prevent erosion to the Plaintiff[s'] property. There is nothing that the Court found that would indicate that the [Association] have a duty to prevent the erosion which caused damage to Plaintiff[s'] property.

> The Court realizes that the [Association] did take on several steps in regards to prevent erosion . . . on the [A]ssociation's property. But that doesn't, in this Court's opinion, somehow or another bootstrap in the adjoining neighbor into a duty for the [Association] to prevent erosion on their property.

The trial court additionally found that there was nothing in the pleadings or depositions indicating that the maintenance of a roadway by the Association caused erosion from October 28, 2010, forward (three-year lookback period for purposes of statute of limitations referenced in earlier opinion). In sum, the court ruled that the Association simply did not have a duty to prevent erosion on plaintiffs' adjacent properties. The trial court subsequently entered an order granting summary disposition in favor of the Association for the reasons stated on the record. The order did not indicate whether the trial court was granting summary disposition under MCR 2.116(C)(8) or (10), or both, and the court did not specify one way or the other at the hearing. However, it appears by the nature of the court's comments at the hearing that the court relied on both MCR 2.116(C)(8) and (10). Plaintiffs appeal as of right.

On appeal, plaintiffs contend that the Association exercised exclusive control over common areas, including a park, the beach, the ravine, and the streets, and that when the Association engaged in the performance of certain undertakings, such as altering the flow of water on its property, the Association had a duty to plaintiffs to exercise due care in conducting the undertakings. Plaintiffs argue that there was significant evidence in the record showing that surface water was causing erosion to their lots and that the surface water intruding on plaintiffs' properties was not the result of water naturally draining onto the lots. Minimally, according to plaintiffs, an issue of material fact existed on the matter. Plaintiffs claim that there was evidence that Association streets were built to channel water, diverting the water across plaintiffs' parcels and over the crests of the bluff and ravine and contributing substantially more runoff than water draining over a natural surface. Plaintiffs additionally maintain that there was documentary evidence that Association catch basins and drain tiles caused considerable erosion of the ravine's slope, damaging the Howards' ravine lots. Plaintiffs assert that the Association itself noted that its drainage system had not effectively managed springtime rains in 2013. Plaintiffs further

---

[6] We shall return to the "berm" matter below.

argue that "[i]n addition to changing the flow of water over the bluff and ravine, which has caused most of the damage to the [plaintiffs'] properties, the [Association] also altered the flow of water on the Association beach when it constructed the massive seawall along the southern part of Outlot 9."

In *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011), the Michigan Supreme Court addressed the standard of review that is equally applicable to the instant action, observing:

> This Court reviews de novo a trial court's decision on a motion for summary disposition. This Court also reviews de novo questions of law. Whether a defendant is under a legal obligation to act for a plaintiff's benefit—i.e., whether a defendant owes a particular plaintiff a duty—is a question of law.[7]

---

[7] With respect to MCR 2.116(C)(8), which provides for summary disposition when a "party has failed to state a claim on which relief can be granted," it tests the legal sufficiency of a complaint. *Beaudrie v Henderson*, 465 Mich 124, 129; 631 NW2d 308 (2001). The trial court may only consider the pleadings in rendering its decision. *Id.* All factual allegations in the complaint are accepted as true. *Dolan v Continental Airlines/Continental Express*, 454 Mich 373, 380-381; 563 NW2d 23 (1997). "The motion should be granted if no factual development could possibly justify recovery." *Beaudrie*, 465 Mich at 130. In *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013), this Court set forth the governing principles applicable to a motion for summary disposition brought pursuant to MCR 2.116(C)(10):

> In general, MCR 2.116(C)(10) provides for summary disposition when there is no genuine issue regarding any material fact and the moving party is entitled to judgment or partial judgment as a matter of law. A motion brought under MCR 2.116(C)(10) tests the factual support for a party's claim. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). A court may only consider substantively admissible evidence actually proffered relative to a motion for summary disposition under MCR 2.116(C)(10). [Citations and quotation marks omitted.]

"Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party." *Skinner v Square D Co*, 445 Mich 153, 162; 516 NW2d 475 (1994); see also *Dextrom v Wexford Co*, 287 Mich App 406, 415; 789 NW2d 211 (2010) (a court must draw all reasonable inferences in favor of the nonmoving party).

-5-

"To establish a prima facie case of negligence, a plaintiff must prove the following elements: (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages." *Id.* at 162. Thus, a defendant cannot be held liable in a suit unless the defendant owed the plaintiff a legal duty. *Id.* Summary disposition in favor of a defendant is proper "if the plaintiff fails to establish a duty in tort." *Beaudrie v Henderson*, 465 Mich 124, 130; 631 NW2d 308 (2001). In determining whether a legal duty exists, courts examine a variety of factors, including the relationship of the parties, the foreseeability of the harm, the degree of certainty of injury, the closeness of connection between the conduct and injury, the moral blame attached to the conduct, the policy of preventing future harm, and the burdens and consequences of imposing a legal duty. *In re Certified Question from the Fourteenth District Court of Appeals of Texas*, 479 Mich 498, 505; 740 NW2d 206 (2007); *Valcaniant v Detroit Edison Co*, 470 Mich 82, 86; 679 NW2d 689 (2004). Taking into consideration these factors, "the ultimate inquiry in determining whether a legal duty should be imposed is whether the social benefits of imposing a duty outweigh the social costs of imposing a duty." *In re Certified Question*, 479 Mich at 505.

"The most important factor to be considered is the relationship of the parties." *Id.* "The determination of whether a legal duty exists is a question of whether the relationship between the actor and the plaintiff gives rise to any legal obligation on the actor's part to act for the benefit of the subsequently injured person." *Id.* at 505-506 (quotation marks omitted). The Supreme Court in *In re Certified Question*, *id.* at 508-509, concluded as follows:

> To summarize, in determining whether a defendant owes a duty to a plaintiff, competing policy factors must be considered. Such considerations include the relationship of the parties, the foreseeability of the harm, the burden that would be imposed on the defendant, and the nature of the risk presented. Where there is no relationship between the parties, no duty can be imposed, but where there is a relationship, the other factors must be considered to determine whether a duty should be imposed. Likewise, where the harm is not foreseeable, no duty can be imposed, but where the harm is foreseeable, other factors must be considered to determine whether a duty should be imposed. Before a duty can be imposed, there must be a relationship between the parties and the harm must have been foreseeable. Once it is determined that there is a relationship and that the harm was foreseeable, the burden that would be imposed on the defendant and the nature of the risk presented must be assessed to determine whether a duty should be imposed.

In the landmark case of *Moning v Alfono*, 400 Mich 425, 437-438; 254 NW2d 759 (1977), our Supreme Court, quoting Dean Prosser, explained the legal concept of "duty," stating:

> "Duty" comprehends whether the defendant is under any obligation to the plaintiff to avoid negligent conduct; it does not include where there is an obligation the nature of the obligation: the general standard of care and the specific standard of care.

> Dean Prosser observed:

> "It is quite possible, and not at all uncommon, to deal with most of the questions which arise in a negligence case in terms of duty. Thus the standard of

conduct required of the individual may be expressed by saying that the driver of an automobile approaching an intersection is under a duty to moderate his speed, to keep a proper lookout, or to blow his horn, but that he is not under a duty to take precautions against the unexpected explosion of a manhole cover in the street. But the problems of duty are sufficiently complex without subdividing it in this manner to cover an endless series of details of conduct. It is better to reserve duty for the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other, and to deal with particular conduct in terms of a legal standard of what is required to meet the obligation. In other words, duty is a question of whether the defendant is under *any* obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same, to conform to the legal standard of reasonable conduct in the light of the apparent risk. What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty." [Emphasis added.]

As revealed in this passage and reiterated in *Valcaniant*, 470 Mich at 86 n 4, "[d]uty concerns whether a defendant is under *any* obligation to act for the benefit of the plaintiff." (Emphasis in original.) And "[i]t is recognized law that a party has a legal duty to adjacent property owners[.]" *Littell v Knorr*, 24 Mich App 446, 449; 180 NW2d 337 (1970). Liability can arise from such conduct as changing the level of one's property, "pounding, compacting soil, [or creating] vibrations," which cause damage to adjacent property. *Id.* at 449-450. Our Supreme Court has observed that "[h]e who alleges injury sustained through the negligence of his neighbor, with whom he has no contract relations and who owes him no other duty than that he shall observe reasonable care to prevent injury, must prove the facts from which an inference of the particular act of negligence charged can be drawn." *Woods v Chalmers Motor Co*, 207 Mich 556, 564; 175 NW 449 (1919) (citation and internal quotation marks omitted.) Here, we hold that with respect to the issue whether *any* legal duty exists under tort law, the Association clearly owes a duty to plaintiffs, considering that the Association, as owner of the various common areas and lakefront lots 8-11, owns property adjacent to plaintiffs' lots. "Every person engaged in the performance of an undertaking has a duty to use due care or to not unreasonably endanger the person or property of others." *Hill v Sears, Roebuck & Co*, 492 Mich 651, 660; 822 NW2d 190 (2012).

The question posed in this case, framed more accurately and precisely, concerns the scope of the Association's duty or the standard of conduct required to satisfy the duty. For the reasons discussed below, we hold that the standard of conduct required of the Association, or the scope of its duty under tort law, does not entail taking affirmative measures to prevent or minimize erosion affecting plaintiffs' parcels. However, we further hold that the standard of conduct required of the Association, or the scope of its duty under tort law, does include refraining from engaging in negligent conduct that diverts or increases the natural flow of surface water so as to cause erosion of plaintiffs' lots beyond any erosion that would have occurred as a result of the natural flow of surface water.

Shortly after the turn of the twentieth century, our Supreme Court in *O'Connor v Hogan*, 140 Mich 613, 623-624; 104 NW 29 (1905), stated that while "the natural flowage of water from [an] upper estate is a natural servitude which the owner of [a] lower estate must bear[,]" "one proprietor cannot divert a natural water way so that its waters shall be discharged upon his neighbor." (Quotation marks omitted.) Even when riparian rules apply, a defendant cannot

pollute water "or unreasonably increase the flow to the extent that it floods [another's] property." *Kernen v Homestead Dev Co*, 232 Mich App 503, 512; 591 NW2d 369 (1998). In *Wiggins v City of Burton*, 291 Mich App 532, 563-564; 805 NW2d 517 (2011), this Court, citing in part *O'Connor*, explained:

> It has been the settled law of this State for more than a century that the natural flow of surface waters from the upper, dominant estate forms a natural servitude that encumbers the lower, servient estate. The owner of the lower, servient estate must bear this natural servitude, and is bound by law to accept the natural flow of surface waters from the upper, dominant estate. It is similarly well settled, however, that the owner of the upper estate has no right to increase the amount of water that would otherwise naturally flow onto the lower estate. For instance, it has been said that the owner of the upper estate cannot, by artificial drains or ditches, collect the waters of his premises, and cast them in a body upon the proprietor below him to his injury. Nor may the owner of the upper estate concentrate the surface water, and pour it through an artificial ditch or drain, in unusual quantities and greater velocity, upon an adjacent proprietor. Stated another way, the owner of the dominant estate may not, by changing conditions on his land, put a greater burden on the servient estate by increasing and concentrating the volume and velocity of the surface water. [Citations, quotation marks, ellipsis, and alteration brackets omitted.]

In light of this precedent, it is quite evident that the Association has a duty not to engage in unreasonable or negligent conduct that diverts or increases the natural flow of waters so as to cause injury to plaintiffs' properties in the form of erosion that otherwise would not have occurred. This standard of conduct or obligation is not based on any Association-member relationship, but rather on the fact that the Association and plaintiffs own neighboring properties and that surface waters in the area generally drain or flow toward or to Lake Michigan.

Plaintiffs cite *Stanley v Town Square Coop*, 203 Mich App 143; 512 NW2d 51 (1993), in support of their position of a more broad duty or standard of conduct that requires the Association, based on the Association-member relationship, to exercise affirmative erosion-control measures for plaintiffs' benefit. In *Stanley*, the plaintiff was robbed and raped in the parking lot of a cooperative, and this Court ruled:

> As a preliminary matter, we must decide whether prior judicial decisions discussing the duty owed in the landlord/tenant context are applicable in this case. Because a landlord exercises exclusive control over the common areas of the premises, the landlord is the only one who can take the necessary precautions to ensure that the common areas are safe for those who use them. Similarly, a cooperative association has exclusive control over the common areas of the cooperative, and the association is the only one that can act to make the common areas safe. We are satisfied that with regard to premises liability, the duty a cooperative association owes those who come on the premises is the same as the duty a landlord owes those who come on its premises. [*Id.* at 146.]

*Stanley* is simply inapposite. We are not addressing a personal injury action, nor are we addressing an injury that specifically occurred within the boundaries of a common area owned and controlled by the Association. Keeping the common areas free of any dangerous conditions

on the land in order to prevent injury to persons traversing the land does not equate to implementing erosion-control measures in the common areas for the benefit of surrounding property owners. This is not a premises liability case. If there was any contractual obligation for the Association to affirmatively prevent erosion from impacting lots owned by Association members, then a contract action would be appropriate, but absent an independent basis in tort to establish a duty to control erosion, which plaintiffs have not shown, a tort action cannot be sustained. See *Fultz v Union-Commerce Assoc*, 470 Mich 460; 683 NW2d 587 (2004).[8] We note that three of the plaintiffs in the instant suit testified in their depositions that they were unaware of any Association bylaws or documents that required the Association to prevent erosion on plaintiffs' property. Furthermore, simply because the Association may have implemented erosion-control measures to benefit itself and its property or to benefit lot owners other than plaintiffs does not mean that a legal duty or standard of conduct was created requiring the Association to do the same for plaintiffs. Mere unfairness does not give rise to a legal duty in tort. Plaintiffs have not provided any facts or persuasive authority that would justify the imposition of a duty in tort law on an association to take affirmative measures to prevent erosion on property belonging to association members.

Keeping in mind the proper standard of conduct or scope of the Association's duty, we first examine and consider whether plaintiffs pleaded sufficient allegations for purposes of (C)(8) analysis. We initially note that plaintiffs' argument at summary disposition reflected a shift from the second amended complaint, with plaintiffs primarily focusing attention on actions by the Association that allegedly caused or increased erosion relative to plaintiffs' parcels, whereas the complaint spoke more in terms of the Association failing to take affirmative steps or measures to prevent erosion of the lots. That said, we conclude that the complaint's language alleging that erosion is being caused by runoff from common areas, including streets, and that the Association has a duty to stop said erosion, while fairly vague, can be construed as broadly encompassing negligent Association conduct that diverted or increased the natural flow of surface water so as to cause erosion of plaintiffs' lots. Therefore, to the extent that the trial court granted summary disposition in favor of the Association under MCR 2.116(C)(8), the trial court erred.

With respect to MCR 2.116(C)(10) and the documentary evidence, we initially note that plaintiffs attached excerpts from deposition transcripts to their response to the Association's motion for summary disposition, and the excerpts appear to reflect a tiny portion of the full transcripts or depositions, making it difficult for us to ascertain proper context at times.[9]

---

[8] In *Fultz*, 470 Mich at 469-470, our Supreme Court held:

> To summarize, if defendant fails or refuses to perform a promise, the action is in contract. If defendant negligently performs a contractual duty or breaches a duty arising by implication from the relation of the parties created by the contract, the action may be either in contract or in tort. In such cases, however, no tort liability arises for failing to fulfill a promise in the absence of a duty to act that is separate and distinct from the promise made.

[9] We also note that in the depositions, the deposed individuals often pointed to a diagram, map, survey, or some type of exhibit when testifying, and we have no way to discern what was being pointed at by the deponent.

Plaintiffs' erosion-control expert, Ryan Ysseldyke, testified that the erosion relative to the bluff and the ravine was "predominantly caused by water flowing over the crest." Ysseldyke indicated that the natural migration of surface waters was to the west and Lake Michigan. Ysseldyke opined that the fix to the erosion problem would be to implement measures that controlled the water coming down Lake Terrace, a paved roadway, and to have a secondary drainage system near the crest to collect any water that overflowed the road system, with the secondary system transporting the water to the base of the bluff. Finally, Ysseldyke testified that hard surfaces like roadways increase the natural flow of water, contributing significantly more runoff to the areas of erosion.

Two pages of a deposition of Curtis Hall were submitted by plaintiffs. Hall apparently is an engineer who devised an erosion-control plan for other persons living in the Association. In response to a question asking him whether he had reached any conclusion regarding what was causing the erosion, Hall stated:

> Yes. There's a considerable amount of surface runoff coming from the watershed area. It is congregating right here at this point. Some time ago, the date's unknown to me, there was a very small catch basin and only a 12-inch solid tile to carry that load. What was happening, the litter from the forest was plugging that catch basin. Water was running beyond or past the catch basin and eroding the slope, exposing the tile, and the tile's essentially plugged. So . . . all the erosion was caused by the surface and the velocity of the water running down that slope.

It appears that Hall was speaking of the vicinity in and around the ravine, and he additionally testified that the drainage system pertaining to the area of the ravine "was the wrong system for the site." He also mentioned that there was "tile fully exposed haphazardly laying in the ravine."

Plaintiff Geraldine Reed testified that the Association had put in a berm in another area of the subdivision, Sunset Park, about four or five years earlier, that the berm diverted water into a drain, that, despite the berm, water was still "draining over and eroding . . . the corner of our lot," and that she had "no idea" whether the berm built by the Association contributed to erosion on her property, but the property was eroding.[10] Reed further testified that water came down Lakeview Terrace because there was "no catch basin or drain to catch the water to get rid of it." She indicated that Lakeview Terrace and her lots were downhill from some area that she pointed to on an exhibit.

Chuck Beatty, former president of the Association, testified about a silo drain at the bottom of the ravine in outlot 9. He indicated that it collected water coming from all over "through a variety of ravine networks." Beatty also testified that three or possibly four area drains collect surface water into a single pipe that ends up jutting out of the side of the ravine. Beatty stated that with significant rainfall, the drains would plug with leaves, which had occurred twice, and "the extra water . . . caused what we call a blowout or a large erosion problem at

---

[10] This is the infamous "berm" referred to in the earlier opinion.

Sunset Park and twice those large blowouts have had to be repaired." Beatty additionally testified that the Association put in a new seawall to protect the Association's source of water, the wells. Beatty spoke of "a 100 year weather event" that happened in the spring of 2013 that "caused some real problems."

In meeting minutes dated July 21, 2013, the Association's board indicated that "drainage affects everything in the Association." Plaintiffs submitted meeting minutes covering a three-year period, 2010 to 2013. Plaintiffs contend that those minutes show that the Association was aware of the erosion to the bluff, ravine, and plaintiffs' lots and that the Association repeatedly failed to take corrective measures to control the erosion.

Plaintiffs needed to submit documentary evidence sufficient to create a genuine issue of material fact regarding whether the Association engaged in negligent conduct that diverted or increased the natural flow of surface water so as to cause erosion of plaintiffs' lots beyond any erosion that would have occurred as a result of the natural flow of surface water. And, given the opinion issued by the previous panel concerning the statute of limitations, we are confined to examining evidence pertaining to conduct and erosion occurring on or after October 28, 2010. With respect to the "berm," plaintiffs failed to present evidence showing that it was negligently maintained or, assuming negligence, that the berm diverted or increased the natural flow of surface water so as to cause erosion of plaintiffs' lots that otherwise would not have occurred. Mrs. Reed testified that she had "no idea" whether the berm contributed to the erosion.

With respect to the operation of drains and catch basins, there was testimony of them plugging up at times with leaves and forest litter, allowing running surface waters to bypass them and cause erosion. And Hall testified that the drainage system for the ravine "was the wrong system for the site." However, the documentary evidence presented by plaintiffs was undeveloped and greatly lacking in details and specifics on matters of time, place, conduct, extent and location of impact, and unreasonableness or negligence. We conclude that plaintiffs failed to create a genuine issue of material fact regarding whether the drains and catch basins were negligently maintained during the relevant time period and whether they diverted or increased the natural flow of surface water so as to cause erosion of plaintiffs' lots that otherwise would not have occurred.

With respect to the seawall, there was woefully inadequate evidence regarding whether it was negligently constructed or maintained and whether it caused erosion to plaintiffs' properties that otherwise would not have taken place.

Finally, with respect to the Association's streets, chiefly Lake Terrace, there was testimony that its paved surface and its elevation diverted and increased the natural flow of surface water such that it contributed to the erosion of plaintiffs' lots. However, once again, the testimony was extremely short on details relative to negligence, diversion of or increase in surface water, and extent and location of impact. And an additional problem for plaintiffs is that the Association roads had existed for many years, and plaintiff K. Don Reed testified in his deposition that they were paved back in the 1990s. To the extent that it is argued that Lake Terrace is currently being maintained in a negligent manner because of the diversion and increase of surface water and its impact on the bluff, ravine, and plaintiffs' properties, the record is simply not developed enough by plaintiffs' documentary evidence to create the necessary factual dispute.

-11-

With respect to the law of nuisance, in *Adkins v Thomas Solvent Co*, 440 Mich 293, 302-303; 487 NW2d 715 (1992), the Supreme Court observed, in pertinent part:

> A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land. It evolved as a doctrine to resolve conflicts between neighboring land uses. Because nuisance covers so many types of harm, it is difficult to articulate an encompassing definition. Imprecision in defining nuisance leads to confusion regarding the interest it is designed to protect. Nevertheless, the gist of a private nuisance action is an interference with the occupation or use of land or an interference with servitudes relating to land. There are countless ways to interfere with the use and enjoyment of land including interference with the physical condition of the land itself, disturbance in the comfort or conveniences of the occupant including his peace of mind, and threat of future injury that is a present menace and interference with enjoyment. The essence of private nuisance is the protection of a property owner's or occupier's reasonable comfort in occupation of the land in question. [Citations omitted.]

Assuming that the intrusion of surface water constitutes a "nontrespassory invasion," we conclude that the same evidentiary shortcomings that defeat plaintiffs' negligence claim also ultimately defeat the nuisance cause of action.

Affirmed. Having fully prevailed on appeal, taxable costs are awarded to the Association under MCR 7.219.

/s/ Joel P. Hoekstra
/s/ William B. Murphy
/s/ Jane E. Markey